

# EXHIBIT 2
## TO
## DECLARATION OF ANGELO L. ROSA IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

Electronically Filed
10/10/2023 7:20 PM
Idaho Supreme Court
Melanie Gagnepain, Clerk of the Court
By: Brad Thies, Clerk

# IN THE SUPREME COURT OF THE STATE OF IDAHO

| | |
|---|---|
| JULENE DODD and WILLIAM DODD,<br><br>Plaintiffs-Appellants,<br><br>v.<br><br>RORY JONES, ESQ. and JONES WILLIAMS FUHRMAN GOURLEY, P.A.<br><br>Defendants-Respondents. | Docket No. 50748-2023 |

---

## APPELLANTS' OPENING BRIEF

---

Appeal from the District Court of the Fourth Judicial District in and for Ada County
The Honorable Cynthia Yee-Wallace, presiding.

Angelo L. Rosa (Idaho State Bar No. 7546)
ROSA PLLC
950 West Bannock Street, Suite 1100
Boise, Idaho 83702
Telephone:    +1 (208) 900-6525
Fax:    +1 (208) 515-2203
e-Mail:    arosa@rosacommerce.com

Gary L. Cooper
COOPER & LARSEN, CHTD.
151 North Third Avenue, Second Floor
Pocatello, Idaho 83205-4229
Telephone:    +1 (208) 235-1145
Facsimile:    +1 (208) 235-1182
e-Mail:    gary@cooper-larsen.com

*Attorneys for Plaintiffs-Appellants*

*Attorneys for Defendants-Respondents*

**TABLE OF CONTENTS**

**TABLE OF CONTENTS**................................................................................... i

**TABLE OF CASES AND AUTHORITIES** ............................................... ii

**STATEMENT OF THE CASE**...........................................................................1

    A.  **Nature of the Case**.............................................................................1

    B.  **Statement of Facts**............................................................................3

    C.  **Lower Court Proceedings**...............................................................16

**ISSUES PRESENTED ON APPEAL**..............................................................20

**ARGUMENT**.....................................................................................................22

    A.  **The Lower Court's Erred in Denying Plaintiff's Motion for Partial Summary Judgment and Grant of Defendants' Motion for Summary Judgment**…………..22

    B.  **Defendants' Failure to Carry Their Burden of Proof as the Party Moving for Summary Judgment Mirrors Their Failure to Demonstrate the Opposite When Opposing Plaintiff's Motion for Partial Summary Judgment**……………..…….29

    C.  **The Lower Court Erred by Denying Julene and Bill's Motion for Summary Judgment as to Breach of Contract**…………………………………………...32

    D.  **The Lower Court Grossly Abused its Discretion by Granting Defendants' Motion in Limine, Excluding the Testimony of Rebecca Czarnik, R.N**……………..…33

    E.  **The Lower Court's Grant of Defendants' Motion to Strike Dr. Simon's Expert Disclosures Displays a Shocking Failure to Follow the Law and Apply the Facts**..40

    F.  **The Nature of the Lower Court's Rulings and the Absence of Cogent Reasoning in Making Those Rulings Raises the Inevitable Quesiton of How Could the Lower Court Get So Much So Wrong**…………………………………………..47

**CONCLUSION**…………………………………………………………………50

## TABLE OF CASES AND AUTHORITIES

### Federal Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505 (1986) .......................................24

*Daubert v. Merrell Dow Pharms..*, 509 U.S. 579, 113 S. Ct. 2786 (1993) ...................................30

*Rush v. Weinstein*, 2022 U.S.Dist. LEXIS 72155 (2022).................................................................34

*Williams v. Pennsylvania*, 579 U.S. 1 (2016).................................................................................47

### State Cases

*Beus v. Beus*, 151 Idaho 235, 254 P.3d 1231 (2011) ......................................................................33

*Brauner v. AHC of Boise, LLC*, 166 Idaho 398 (2020)...................................................................35

*Brown v. Matthews Mortuary, Inc*., 118 Idaho 830, 801 P.2d 37 (1990) .......................................25

*Callies v. O'Neal*, 147 Idaho 841, 216 P.3d 130 (2009) ................................................................24

*Coombs v. Curnow*, 148 Idaho 129, 219 P.3d 452 (2009) ..............................................................30

*Cramer v. Slater*, 146 Idaho 868 (2009) ........................................................................................35

*Gunter v. Murphy's Lounge L.L.C.*, 141 Idaho 16 (2005)...............................................................34

*Hansen v. Roberts*, 154 Idaho 469 (2013).......................................................................................34

*Heinze v. Bauer*, 145 Idaho 232, 178 P.3d 597 (2008)...................................................................26

*Infanger v. City of Salmon*, 137 Idaho 45, 44 P.3d 1100 (2002)....................................................24

*La Bella Vita, LLC v. Shuler*, 158 Idaho 799, 353 P.3d 420 (2015)...............................................33

*Lapham v. Stewart*, 137 Idaho 582, 51 P.3d 396 (2002) .................................................................25

*Liberty Bankers Life Ins. Co. v. Witherspoon, Kelley, Davenport & Toole, P.S.*, 159 Idaho 679, 365 P.3d 1033 (2016) ...............................................................................................................................24

*Lunneborg v. My Fun Life*, 163 Idaho 856 (2018) ..........................................................................34

*McKay v. Owens*, 130 Idaho 148, 937 P.2d 1222 (1997) ...............................................................28

*Mortensen v. Baker*, 170 Idaho 744 (2022) ..................................................................................35

*Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 995 P.2d 816 (2000) ..................................30

*Roe v. Doe*, 129 Idaho 663 (Ct. App. 1996) ..................................................................................38

*Sadid v. Idaho State University*, 151 Idaho 932, 265 P.3d 1144 (2011) .........................................24

*Southern Idaho Production Credit Association v. Astorquia*, 113 Idaho 526 (1996) ......................37

*State v. Konechny*, 134 Idaho 410, 3 P.3d 535 (Ct. App. 2000) .....................................................30

*State v. Le Veque*, 164 Idaho 110 (2018) ......................................................................................35

*Venable v. Internet Auto Rent & Sales, Inc.*, 156 Idaho 574, 329 P.3d 356 (2014) ........................33

*Viehweg v. Thompson*, 103 Idaho 265, 647 P.2d 311 (Ct. App. 1982) ...........................................31

*Weeks v. E. Idaho Health Servs.*, 143 Idaho 834, 153 P.3d 1180 (2007) ........................................30

*Zylstra v. State*, 157 Idaho 457 (2014) .........................................................................................39

State Rules

I.R.C.P. 11 ...........................................................................................................................2, 14, 23

I.R.C.P. 26(b)(4) ...........................................................................................................................36

I.R.C.P. 26(e)(2) ...................................................................................................................36, 41-46

I.R.C.P. 26(e)(3) ...........................................................................................................................36

I.R.C.P. 43(b)(2) ...........................................................................................................................31

I.R.C.P. 56(c)(1) ...........................................................................................................................33

iii

## I.    STATEMENT OF THE CASE

### A.    Nature of the Case

This is an appeal of the Judgment entered on 19 April 2023 (the "Judgment"), the omnibus Order entered on 14 April 2023 giving rise to the Judgment (the "14 April Order"), and the Protective Order entered on 22 December 2022: all entered by Judge Cynthia Yee-Wallace of the Fourth Judicial District Court in and for the County of Ada (the "lower court"). [R. 5013-5095][1] The contents of Appellants' briefing will displease many, perhaps because it requires this Honorable Court to confront several unspoken but nonetheless real dynamics that exist in the unusually close relationship between bench and bar in Idaho and demonstrates how priorities are ordered in relation to the public the legal profession and judiciary exist to serve, in theory anyway…

Appellants, Julene and William Dodd ("Julene and Bill") have been physically and legally defiled by three Idaho institutions through three (3) profound injuries that are fairly described as "sickening."

First, by the malpractice of St. Als Medical Center-Nampa ("St. Als.") and its surgical staff including one Forrest Fredline, D.O. ("Fredline") in botching a hiatal hernia repair by piercing Julene's lower intestines and causing her abdomen to fill with feces; in negligent aftercare by ignoring Julene's persistent complaints of pain for three days while administering repeated enemas until septic shock necessitated emergency surgery, turning an overnight hospital stay into a year-long struggle to survive; and in being the direct cause of total renal failure necessitating a thrice-weekly dialysis regimen that continues today.

---

[1] Citations to the appellate record are abbreviated in compliance with Idaho Appellate Rule ("I.A.R") 35(e) as follows: Reporter's Transcript ("Tr."), Clerk's Transcript ("R."), and Clerk's Transcript-Sealed Exhibits ("R-Seal"). Where specific citations are made within specific pages, page and line numbers are identified ("page:line(s)").

Second, by the malpractice of prominent local attorneys who solicited Julene and Bill to file a $5 million malpractice action against St. Als, then spent over two years undertaking eight (8) hours of documented work before filing a complaint for medical malpractice after the statute of limitations expired!

Third and finally, by a freshman district court judge's disillusioning and blind deference to Defendants through her unlawful validation of their judicially estopped defense (i.e., an unconditional denial of the same allegations of medical malpractice made on Julene and Bill's behalf in a complaint they certified and filed under I.R.C.P. 11 in the underlying action); a clutch of haphazard and irreconcilable rulings, including granting an order *in limine* excluding Julene and Bill's timely and substantively inviolable expert disclosures confirming over $8 million in actual damages contrary to every recognized factor justifying the denial of such motions; by striking the unimpeached expert opinions of Julene and Bill's medical expert, establishing a breach of the standard of care through granular analysis (thus establishing causation in their legal malpractice claim against Defendants); and by rendering a verbose and confounding ruling (consisting of unsupported statements, misapplications of the law, and inexplicable confusion about the facts of record) on the parties' three summary judgment motions.

Julene and Bill do not take this appeal solely because the lower court make rulings they disagree with. This appeal must be taken not only to correct the injustices inflicted upon Julene and Bill, but to raise (perhaps in vain) a course of conduct and broader problem that arises whenever an attorney is sued for malpractice in the State of Idaho. How so complete deviation from governing legal standards and an unnerving refusal to acknowledge admissible evidence in the record can be made is shocking. The undersigned represents that these rulings are so unpredicted in twenty years of practicing law across two dozen distinct jurisdictions that they demand an examination the

2

presiding judge's fitness to render competent rulings and capacity for impartiality against the existing standard for judicial bias and in the context of properly defined judicial bias.

This is not an ivory-tower plea for human justice. This appeal is advocated in full acknowledgment that that Idaho judiciary and the practice of law have evolved in such a way that the relationship between bench and bar shields attorneys from accountability and anything resembling "justice" is advocated so long as the injured party is not attempting to sue their former counsel for malpractice. No appellate decision in the past thirty years has led to a ruling that favors the client over counsel. The standard for determining judicial bias defies the due process safeguards defined by the United States Supreme Court. *See* Section III(F), *infra*. Now, even the ability to disqualify judges in civil matters is under attack.[2] Neither Julene and Bill nor the undersigned counsel are so naïve to expect immediate corrections to the self-serving nature of the judiciary. The only naiveté may rest in the expectation that both principles of well-established law and broader principles of justice might be followed. However, this Court's affirmation of the lower court's appalling injustices suffered by Julene and Bill (just as they are suffered by countless others) will only serve to reinforce the unappetizing truth that, for the good people of Idaho, justice is available so long as you do not seek to hold your attorneys accountable despite their appalling negligence.

So, with only the lowest of expectations, Julene and Bill ask this Court to follow the law, properly consider the actual facts and correct the departure from sound, competent and reasoned adjudication reflected in the lower court's 14 April Rulings and render a competent ruling that reflects the principles of due process identified by the United States Supreme Court.

### B.    Statement of Facts

#### 1.    The Underlying Medical Malpractice

---

[2] https://isb.idaho.gov/wp-content/uploads/ISC_Statement_Public_Comment.pdf

In mid-2017 Julene visited her primary care doctor, Dr. Cherese Tarter ("Dr. Tarter"), presenting with intermittent chest pain and shortness of breath [R. 516 ¶4], initially thought to be caused by allergies. [R. 516 ¶¶4-5]. Julene returned the following month with similar symptoms and was referred to Saint Alphonsus Regional Medical Center in Nampa ("St. Als") for a chest CT scan. [R. 516 ¶4] The scan revealed the actual cause of Julene's symptoms to be a large hiatal hernia: most of her stomach was in her chest and putting pressure on her lungs. [R. 548 ¶44] An endoscopy performed by St. Als physician, Dr. Forrest R. Fredline ("Dr. Fredline"), confirmed the scan results. [R. 516 ¶6, 550 ¶60; R-Seal 358] On August 2, 2017, Julene underwent further testing at Saint Alphonsus in preparation for hernia repair surgery, which showed no contraindications to surgical hernia repair. [R-Seal 1] The next four (4) days altered Julene's life permanently:

### (a)    The First Day: August 15, 2017

On August 16, 2017, Dr. Fredline performed a common procedure for hiatal hernia repair. [R. 548 ¶45; R-Seal at 12] Surgical notes indicate that Dr. Fredline noticed a "small tear in the right [lung]" after beginning surgery but continued the procedure because Julene's airway pressures did not change. [R. 548 ¶45; R-Seal at 12] He inserted a portion of reconstructive tissue matrix into her abdomen but left a portion of needle (he claimed had snapped off during the procedure) inside Julene's body. [R. 548 ¶45; R-Seal at 12] Dr. Fredline attempted to justify this incompetence in the following notes:

> "it was too difficult to suture using the EndoStitch device…As part of trying to remove the mesh from the suture device, a small portion of the needle fractured into the abdominal space…the small blunt portion of needle that fractured was unable to be located. The decision was made to proceed with the surgery as this was such a small portion of needle that would be inconsequential." [R. 548 ¶45; R-Seal at 12].

Dr. Fredline continued surgery using a different type of mesh. [R. 548 ¶45; R-Seal at 12] After the procedure, Dr. Fredline told Julene the surgery was more difficult than he had expected. [R. 517 ¶8] Nevertheless, he told Julene that she could return home the following day. [R. 516-517 ¶7]

### (b)    The Second Day: August 17, 2017

Julene did not go home the following day. Instead, on August 17, 2017, she began experiencing acute blood loss anemia and required a transfusion. [R. 548 ¶46, R-Seal 16] Dr. Fredline also ordered a regimen of enemas to be administered because he wanted Julene to have a bowel movement prior to being discharged. [R. 517 ¶9; R-Seal 16] After each enema over the course of the day, Julene complained to the attending nurse that she was experiencing abdominal pain that increased after each enema was administered. [R. 517 ¶10] Dr. Fredline was informed of this but dismissed the pain as incidental to the incision from the surgery. [R. 517 ¶10]

### (c)    The Third Day: August 18, 2017

The next day (August 18, 2017), Dr. Fredline ordered the regimen of enemas continue for Julene. [R-Seal 16] Again, throughout the day, Julene complained to the nursing staff attending her that she was in increasing pain, that the pain was not limited to the area of her incisions; the pain was in the right lower quadrant of her abdomen, not in the area of her surgical incisions. [R. 517 ¶10, 487 ¶23] Again, the pain continued to become worse after each enema. [R. 517 ¶10] Again, she continued to tell her nurses that her pain had increased, and she also began to have difficulty breathing. [R. 517 ¶11] Again, Julene's complaints continued to be dismissed and nothing was done to investigate the cause or even lessen her suffering [R. 517-518 ¶¶11-12, 487 ¶22], including a physician assistant also visited Julene that day (though the notes of the visit were transcribed on August 19, without reference to the date of examination). [R. 518 ¶13, R-Seal 54] Again, Julene's pain continued into the night and she felt increasingly unwell. [R. 517 ¶11]

### (d)    The Fourth Day: August 19, 2017

5

On August 19, 2017, Julene collapsed as she tried to get out of bed with assistance. suffering [R. 517-518 ¶12, 1130 ¶6] Her heart rate had become erratic, compelling Dr. Fredline to order a CT scan. [R. 517-518 ¶12, 487 ¶23] Results of the scan indicated the true cause of Julene's pain: "moderate volume ascites [fluid] throughout [Julene's] abdomen," "bilateral lower lobe atelectasis [collapse of lungs]," "trace bilateral pleural effusions [fluid in the lungs]," and a "large left sided abdominal wall muscular hematoma [bruise]." [R. 488 ¶26-27, R-Seal 39] That afternoon, emergency exploratory surgery was performed to determine the cause of fluid in Julene's abdomen. Before surgery Dr. Fredline told Julene's daughter, Jennifer, that there was free fluid in Julene's abdomen, and that he believed he had "nicked" either her liver or spleen in surgery. He then stated that her vitals were so low she might not survive surgery. The relevant surgical operative report indicates a postoperative diagnosis of "peritonitis with a jejunal enterotomy" (inflammation of the peritoneum, the tissue that lines the abdomen, and a surgical incision into the small intestine). [R. 548 ¶48, R-Seal 42] Laparoscopic surgery revealed Julene's abdomen was filled with fecal matter. [R. 548 ¶48, R-Seal 42] Her abdomen was opened at the midline, revealing "contamination of the entire abdomen with enteric contents [fecal matter]," and an injury to the small intestine with "sharply demarcated edges," meaning the injury was surgical in nature. [R. 548 ¶48, R-Seal 42] Dr. Fredline notes in this operative report that the injury cut through approximately fifty percent (50%) of the diameter of Julene's bowel. [R. 548 ¶48, R-Seal 42] In plain terms, Dr. Fredline nicked Julene's small intestine during the first surgery, causing Julene's abdominal cavity to fill with feces as the hospital staff repeatedly pumped her full of enema fluid as she was complained of increasing pain. [R. 548 ¶48, R-Seal 42] This fecal matter putrefied and caused Julene to develop abdominal sepsis. [R. 488 ¶24, 548 ¶48, R-Seal 42] Julene's abdomen was then irrigated and flushed, then the surgical injury to her bowel was temporarily closed by placing a wound vacuum assisted closure ("V.A.C.") on her abdomen. [R. 548 ¶48, R-Seal 42] To borrow from Dr. Fredline's own synopsis

6

of Julene's condition at that point: "[s]he was in renal failure. She was in respiratory failure. She was in septic shock." [R. 548 ¶51, R-Seal 51]

After this second surgery, Dr. Fredline told Julene's husband, Bill Dodd, Jennifer, and a family friend that "I take full responsibility for this. It's all my fault.**"** [R. 1130 ¶7] Dr. Fredline confirmed his operation notes, explaining that the enemas had caused Julene's entire abdominal cavity to fill with feces, that he flushed out her abdomen, but had to leave her stomach open and would go back in on Monday (August 21, 2017) to re-flush her abdomen and confirm his repair to her bowel had held. [R. 548 ¶48, R-Seal 42] He also confirmed that Julene was in no shape to be discharged. [R. 1131 ¶8] Julene was connected to a ventilator [R. 1131 ¶8] and was transferred to the Intensive Care Unit ("I.C.U."). [R. at 488 ¶26, 548 ¶48; R-Seal 42].

### (e)    The Aftermath: Julene's Coma

On Monday, August 21, 2017, Julene was too weak to undergo a third surgical procedure to close her abdomen. Julene had a chest tube placed in her right chest that day as indicated by her CT scan report. [R. 488 ¶27, 550 ¶61; R-Seal 367] That report also stated that 60 cc of fluid was drained from Julene's right lung and sent for laboratory analysis. [R. 550 ¶61; R-Seal 367] that she had a fever and elevated white blood cell count. [R. 550 ¶61; R-Seal 367] The next day (August 22, 2017), Julene was taken into surgery for "exploratory laparotomy, wash out, closure of fascia, [and] placement of wound V.A.C." [R. 548-549 ¶49; R-Seal 45] Dr. Fredline's notes indicate he observed fluid throughout Julene's abdomen." [R. 548-549 ¶49; R-Seal 45] He irrigated all four quadrants of Julene's abdomen, closed her fascia and again placed a V.A.C. device over the open skin. [R. 548-549 ¶49; R-Seal 45] Julene was returned to the I.C.U., still intubated. [R. 488 ¶26, 548-549 ¶49; R-Seal 45] She remained in a coma for the next two weeks.

The negligence of the St. Als healthcare staff in mismanaging the aftercare following Julene's first surgery and their failure to listen to Julene's repeated complaints led to sepsis and ultimately renal failure. [R. 517-518 ¶¶10-12]

### (f)    Julene's Long Road to "Recovery"

Julene's recovery to a new, severely impaired baseline of function was a slow, uphill battle [R. 518-519 ¶¶14-16]: in the following weeks, Julene was fed intravenously until she became extremely swollen and her wound grew larger rather than smaller, and at one point Julene's toes had turned black. On August 30, 2017, Julene developed acute respiratory failure, requiring placement of an open tracheostomy tube. [R. 488 ¶26, 550 ¶61; R-Seal 367] On September 5, 2017, after additional CT scans [R. 488 ¶27, 550 ¶61; R-Seal 367] she began kidney dialysis. [R. 488 ¶26] However, the following day (September 6, 2017) Julene became unresponsive even to pain, relapsed into a coma, and was taken for a head CT scan while unconscious. [R. 488 ¶26, 549 ¶50; R-Seal 367] Between September 6 and September 9, 2017, doctors unsuccessfully attempted to wean Julene off the ventilator. On September 10, 2017, Julene received a speaking valve for the tracheotomy she received during surgery. She also regained consciousness and became aware of her surroundings again. [R. 518-519 ¶14] Despite a deplorable ineptitude for healthcare, Dr. Fredline managed to summarize Julene's post-operative journey at St. Als with basic accuracy: "She was under the care of the pulmonary team, medicine team, nephrology team, and the Gen. surgery team. She had a complicated hospital course." [R. 549 ¶51; R-Seal 51]

Over the following week, Julene's condition stabilized enough to allow transfer to a critical care hospital. On September 19, 2017, she was released to Vibra Hospital of Boise ("Vibra") in serious condition. [R. 549 ¶51; R-Seal 51] She arrived at Vibra with a wound V.A.C., a tracheotomy with speaking valve in place, blood visible in her catheter bag, and a peripherally inserted central catheter for nutrition. [R. 550 ¶62; R-Seal 382] She could speak only in a faint whisper [R. 550 ¶63;

8

R-Seal 405], had difficulty swallowing, and was suffering from a "stage II" pressure sore. [R. 519 ¶15, 551 ¶65; R-Seal 427] She lacked strength in her arms and legs [R. 550 ¶62; R-Seal 382] that was diagnosed to the severity of "functional quadriparesis" [R. 551 ¶64; R-Seal 421], and nerve damage. Her condition required round-the-clock care by a registered nurse. [R. 550 ¶62; R-Seal 382] Whereas Julene "was fully independent prior to recent hospitalization," she was "now a max assist plus a lift" [R. 550 ¶63; R-Seal 405], meaning she required assistance on a basic level of movement. Nevertheless, she expressed a desire for "aggressive [physical therapy] to get back to her original strength level and independence." [R. 550 ¶62; R-Seal 382] Her circumstances caused to become severely depressed. [R. 551 ¶66; R-Seal 433]

On November 22, 2017—nearly one hundred (100) days after she was admitted for an elective hiatal hernia repair procedure expected to require a single overnight hospital stay—Julene was transferred to Sunny Ridge skilled nursing facility. [R. 520 ¶19, 551 ¶64; R-Seal 421] She was still in serious condition, she still needed wound care, she still had multiple intraabdominal abscesses growing staph, she still had functional quadriplegia, she still remained depressed, and she still required aggressive treatment for constipation, and was now taking thirty-three (33) medications. [R. 551 ¶64; R-Seal 421] Her discharge notes at Vibra describe her as: "[i]mproving but still needs skilled care and a long way to go." [R. 551 ¶64; R-Seal 421]

Julene finally returned home on March 8, 2018 (191 days after her admission to St. Als Hospital for hernia repair). [R. 520 ¶21] She required three (3) months of in-home healthcare because she could not use the restroom, shower, or move from her bed or chair without assistance. [R. 520 ¶21] She has never returned to the level of strength or active lifestyle she enjoyed before her hernia operation. [R. 526 ¶52] In Summer 2020, Julene was diagnosed with gallstones, but her doctor could not justify surgery due to excessive danger caused by scar tissue in her abdomen. [R. 524 ¶42] Julene: the woman who took care of a farm and multiple horses can no longer tend to a

garden, who routinely handled eighty (80) pound hay bales can no longer lift twenty (20) pounds. Vacuuming her home now requires multiple rest breaks. [R. 526 ¶50] She experiences memory loss and must write notes to herself to remember things. [R. 525 ¶46] She can no longer work in her chosen field of insurance brokerage and the consequences of (what should have been) a routine surgery have forced her to retire. [R. 525 ¶46]

### (g)    Bill's Loss of Consortium

Damages also include pain and suffering and the loss of consortium of her husband, Bill. [R. 1132 ¶¶15-16] Because Julene is no longer able to take care of her previous duties at their farm, Bill has lost Julene's labor contributions to the Dodd household. [R. 1135 ¶29, 526 ¶50] Their companionship has suffered, [R. 1135 ¶31, 525 ¶48] and the medical malpractice has destroyed their sex life due to the physical pain it causes Julene. [R. 1135 ¶31, 525 ¶49]

### 2.    Defendants' Legal Representation of Julene and Bill

The second injury to afflict Julene and Bill then came in the form of Rory Jones and the law firm Jones Williams Fuhrman Gourley, P.A. ("JWFG"):

### (a)    Defendants' Solicitation of Julene and Bill for Representation

In late August 2017, while Julene was unconscious in the St. Als I.C.U., Defendant Rory Jones ("Defendant Jones") came to St. Als Hospital in Nampa. [R. 1155 ¶7] Neither Julene (who was in unconscious in the I.C.U. at the time [R. 1155 ¶7, 1132 ¶13, 545 ¶¶30-31, 964, 974-976] and had no recollection of Defendant Jones' visit) [R. 1133 ¶17, 518 ¶13, 1155 ¶¶7-8] nor Bill (who had never before met or spoken with Defendant Jones before. [R. 545 ¶31, 975]) requested or initiated contact with Mr. Jones for any purpose. [R. 1132 ¶13, 545 ¶31, 978] Defendant Jones' only connection to Julene was through his acquaintance with Julene's brother, Jeff Day ("Mr. Day") [R. 1155 ¶7, 545 ¶31, 975], and his representation of Julene in a simple divorce approximately two (2) decades earlier, and Julene had not spoken to him since then. [R. 520 ¶¶20-22, 978, 545 ¶31, 975]

10

Bill had never met Defendant Jones before he came to the hospital unsolicited. [R. 1132 ¶12] Upon meeting Bill, Defendant Jones promptly proposed that Defendants should represent him and Julene [R. 1155 ¶8] and told Bill words to the effect of "this [case] is huge," [R. 1155 ¶8] and "they [Dr. Fredline and St. Als] know that they are going to settle with you." [R. 1132 ¶14] Defendant Jones told Bill that he would have a claim, for loss of consortium. [R. 1132 ¶15]

### (b)      Defendants' Engagement as Counsel

On November 3, 2017, Defendant Jones came to visit with Julene and Bill at the Sunny Ridge facility. [R. 521 ¶25] He brought with him a contingency fee agreement for representation by his firm, Defendant JWFG ("the Agreement"); Julene and Bill signed the Agreement. [R. 549 ¶52, 1078, 521 ¶25, 545 ¶31, 978] Defendant Jones then signed the Agreement on behalf of the Defendants. [R. 545 ¶31, 977]

### (c)      Defendants' (Deficient) Representation

Defendants' representation on Julene and Williams behalf can, upon examination of the following undisputed facts, be charitably described as grossly incompetent:

During the first eighteen (18) months following Defendants' engagement as counsel, neither Julene nor Bill had significant contact with Defendant Jones or any other representatives of Defendant JWFG. [R. 521 ¶26, 1133-1134 ¶¶19-22] During this time, Julene would proactively contact Defendants every few months requesting an update; in response, Defendant Jones would tell her that he was working on her case but provided few details. [R. 521 ¶26] The few substantive tasks undertaken by Defendants were (1) obtaining Julene's signature on releases of information for her medical records [R. 521-522 ¶27] and (2) sending Julene a statement of facts describing her medical ordeal, which Defendants had drafted. [R. 522 ¶28] The only recorded time spent on the Dodd's medical malpractice case was documented in a JWFG document titled "Prebill," which shows a total

11

of 8.1 hours spent on the case – by attorneys other than Mr. Jones. [R. 545 ¶29, 929, 944-945] Regardless of how many hours was spent, the results of Defendants' efforts speak for themselves:

On August 13, 2019 (648 days after Defendants' representation began and 6 days prior to the statutory deadline for filing a medical malpractice claim), Defendant JWFG filed a Pre-Litigation Hearing Application and Claim ("the Claim") with the Idaho State Board of Medicine ("the Board") [R. 549 ¶53, 1081] A pre-litigation hearing was convened on October 24, 2019. Defendants represented Julene at the hearing. Following the hearing, the Board found that no medical malpractice was committed by St. Als or Dr. Fredline. [R. 549 ¶55, 1100-1103] The stated reasons for the Board's findings were that (1) the Claim made no specific allegations against St. Als and only named the hospital "on the basis that it was the employer of Dr. Fredline," [R. 549 ¶55, 1100, 1102] concluding that St. Als's treatment of Julene was therefore within the applicable standard of care [R. 549 ¶55, 1100, 1102-1103]; and (2) concerning Dr. Fredline, "although it is rare, it is a known recognized complication of hiatal hernia repair that a patient's jejunum can be compromised during the course of the surgical procedure," the fact that Julene's jejunum was so compromised was not, "in and of itself...indicative of a violation of the local standard of care notwithstanding the significant medical problems it created post-surgery." [R. 549 ¶55, 1102-1103]" The Board acknowledged that the Claim alleged a delay in diagnosing Julene's compromised jejunum yet determined it could not "conclude from the statements and records presented" that there was such a delay. [R. 549 ¶55, 1100, 1103] The Board considered the two remaining claims of medical negligence against Dr. Fredline – that he ordered enemas to be administered to Julene, and that there was evidence that he left a needle tip in Julene's abdomen–and found neither incident exacerbated or contributed to Julene's post-surgical condition or course of treatment. [R. 549 ¶55, 1100, 1103] In plainer terms, the Board did not find malpractice because Defendants failed to correctly identify St. Als' responsibility through its providing post-surgical care (or lack thereof)

12

and failed to properly identify the specific acts and omissions by St. Als or Dr. Fredline constituted malpractice. Defendants' failure to submit this evidence precluded the independent identification of malpractice by the Board or foreclosed the creation of a record demonstrating the Board's error; regardless, Defendants had either overlooked the evidence required to back up the Claim or had not yet invested the time and resources necessary to competently assess the facts. [R. 549 ¶55, 1100-1103]

Defendants' efforts to identify and engage an expert witness was both qualitatively and quantitatively deficient. During the first half of 2018, Defendant Jones tasked Christopher Graham (then a member of JWFG) with finding a medical expert witness to support Julene's case. [R. 545 ¶31, 968, 982] JWFG did track all time spent on the Dodds' case other than Mr. Jones', and Mr. Graham spent less than 2.3 hours doing so while at the firm. [R. 545 ¶29, 929, 945] Between November 2017 and November 2019, the month of the Board hearing, Mr. Jones did the following: (i) had conversations about the case with several other attorneys [R. 545 ¶31, 968, 977]; (ii) sent Julene's medical file to one of those attorneys (in November 2019) [R. 545 ¶31, 968, 977-978]; and (iii) discussed the case with an ear, nose, and throat doctor, Dr. Schwarz, with whom he was friends. [R. 545 ¶31, 968, 983] Around Christmas 2019, after the lawsuit had been untimely filed, Mr. Jones again spoke to Dr. Schwarz about the case. [R. 545 ¶31, 968, 983] Dr. Schwarz referred Mr. Jones to a Dr. Jon Getz. [R. 545 ¶31, 968, 983] Mr. Jones transmitted Julene's medical file to Dr. Getz, who was the only potential medical expert witness to whom Mr. Jones transferred Julene's medical file. [R. 545 ¶31, 968, 983, 985] Dr. Getz has since deceased. [R. 545 ¶31, 968, 983]

### (d)    Defendants' Failure to Timely File the Medical Malpractice Action

The statute of limitations for filing a medical malpractice action applicable to Julene expired on December 8, 2019. [R. 523 ¶34] Defendants prepared a seven (7) page long Complaint for

13

Damages and Demand for Jury Trial, naming Dr. Forrest Fredline and St. Als Regional Medical Center Nampa as defendants and making claims for "Medical Negligence," "Respondeat Superior," and "Agency by estoppel/Non-delegable duty." [R. 470-476] Pursuant to the requirements of I.R.C.P. 11, Defendant Jones digitally signed the Complaint certifying its purpose and content as meritorious. [R. 476]. However, the complaint was not filed on or before December 8, 2019. Instead, Defendants filed the complaint on December 12, 2019. [R. 470] After 769 days of representation—which Defendants themselves solicited and by their own representations was worth five-million dollars in damages—Defendants blew the filing deadline by four (4) days.

### (e)    Defendants' Intentional Concealment of Their Malpractice from Julene and Bill.

Although Defendants automatically and irreparably prejudiced Julene and Bill's interests by failing to timely file the complaint by December 8, 2019, Defendants' imbecilic incompetence did not stop there: Defendants continued to act as if they were actively working on the case. In January 2020, Defendant Jones communicated with Khristen Vachal-Reese, a Miami-based medical malpractice defense attorney. [R. 523 ¶35, 1139 ¶6] On January 23, 2020, Ms. Vachal-Reese received from Defendant Jones a copy of Julene's medical records on CD. [R. 1139-1140 ¶7] Based on her review of these records, Ms. Vachal-Reese believed Julene had a strong case for medical malpractice. [R. 1139-1140 ¶7] In May 2020, Ms. Vachal-Reese received a second CD containing more of Julene's medical records. [R. 1140 ¶8]. On May 14, 2020, she e-mailed Defendant Jones, suggesting that he quickly contact a medical expert witness with whom she had worked before. [R. 1140 ¶8] She never received a response. [R. 1140 ¶8] On May 20, 2020, she again e-mailed Defendant Jones, urging him to contact the expert because their surgical practice was becoming busy again. [R. 1140 ¶9] She neither received a response to that e-mail [R. 1140 ¶9], nor had any further contact with Defendant Jones again. [R. 1140 ¶10] At no point during their communications

14

did Defendants indicate to Ms. Vachal-Reese that Julene's case was moot due their failure to file the complaint before and that Ms. Vachal-Reese was wasting time and resources in her attempts to assist them. [R. 1140-1141 ¶¶11-12]

While Defendants were actively misrepresenting that the case was still viable to third parties, they were simultaneously avoiding all contact with Julene and Bill, failing to provide them with updates, and not returning phone calls and e-mails from Julene; this shocking lapse in timely communication between attorney and client lasted from January 2020 until April 2020. [R. 523 ¶35] No documented attempts to serve the Complaint and Summonses in the malpractice lawsuit upon the named defendants exist; the docket report for the case confirms that neither the summonses nor the complaint were served at any time. [R. 464-468] Mr. Jones later testified under oath in the present matter that he realized the missed the statute of limitations in Julene and Bill's case in late January of early February 2020. [R. 545 ¶31, 968, 981-982] Yet (perplexingly) Jones continued to interact with Ms. Vachal Reece (as documented above) and acted as if he were actively seeking a medical expert witness for the case until May 2020. [R. 545 ¶31, 986-988, 1140-1141 ¶¶11-12]

### (f)    Defendants' Confessions of Malpractice

Defendants did not inform Julene or Bill that they had failed to timely file the medical malpractice lawsuit, after having over two years to prepare it, until over six (6) months after the malpractice had occurred, in late June 2020. [R. 523 ¶38] In early May 2020, she called JFWG and asked for a litigation update. [R. 523 ¶37] Mr. Jones called her and asked her to come into his office, approximately eight (8) weeks later, on June 26, 2020. [R. 523 ¶38] When Julene got to Mr. Jones' office, Mr. Jones asked her to go into his conference room [R. 523 ¶38]; he then closed the door and met with to her alone [R. 523 ¶38] Jones told Julene that he felt badly and admitted he made a mistake in filing her complaint late. [R. 523 ¶38] He informed Julene that he missed the filing deadline by four (4) days. [R. 523 ¶38] Jones told Julene he had spoken to another lawyer to

determine if there was any way he could proceed with the lawsuit but was told there was not. [R. 523 ¶39] He then informed Julene that he had not even told his partners at Defendant JWFG about the mistake. [R. 523 ¶38] Julene had been unaware that Defendants failed to timely file the lawsuit until this meeting. [R. 523 ¶38] Mr. Jones then told Julene that the lawyer with whom he conferred said that she would be able to sue him to recover her damages. [R. 524 ¶40] Mr. Jones encouraged her to do so and said his malpractice insurance would cover him and that he was getting ready to retire. [R. 524 ¶40] To compound the bizarre chain of events surrounding Defendants individual and collective incompetence, even after Jones' confession of their malpractice, no action was taken to voluntarily dismiss the action: on 10 July 2020, the Court issued a Notice of Proposed Dismissal for Inactivity. [R. 477-479] This was followed by an Order of Dismissal, executed on 29 July 2020 and filed on 30 July 2020. [R. 480-481, 551 ¶71, 1123-1127]

## C.    Lower Court Proceedings

### 1.    Complaint and Preliminary Discovery

Julene and Bill filed the present action on 25 January 2022 and then filed and served a First Amended Complaint on Defendants. [R. 539-543 ¶3, 554-561] On 7 March 2022, the lower court entered a scheduling order. [R. 166-173]

Julene and Bill propounded their first set of interrogatories, requests for admission, and requests for production of documents (collectively, "the Discovery Requests") on Defendants on 10 February 2022. [R. 540-544 ¶¶5-21, 562-867] At Defendants' request, Julene and Bill granted several extensions to the response deadline to the Discovery Requests, and Defendants served their responses on Julene and Bill on 24 March 2022. [R. 540-544 ¶¶5-21, 562-867] These responses necessitated two series of extensive meet and confer correspondence due to their (generic and factually scant) insufficiency. [R. 540-544 ¶¶5-21, 562-867] Defendants produced "supplemental," and "corrected supplemental" responses to Julene and Bill' interrogatories, and Defendant Jones

16

made a third production, a "second supplemental corrected" response to Julene and Bill' interrogatories. [R. 540-544 ¶¶5-21, 562-867] The same pattern occurred with both Defendants' responses to Julene and Bill' Requests for Admission and Requests for Production, admittedly with fewer (but not without) supplemental and corrected responses to those requests being necessary. [R. 540-544 ¶¶5-21, 562-867] In contrast, Julene and Bill' responses to Defendants' discovery requests were robust and direct, and Defendants made no attempt to meet and confer regarding their substance. [R. 548-549 ¶49, 51-557]

### 2. Plaintiffs' Motion for Partial Summary Judgment.

Julene and Bill engaged expert, Dr. Fred Simon ("Dr. Simon"), to opine on the standard of care governing the health care provided to St. Als and Fredline and whether the healthcare at issue fell below the standard of care. [R. 482-514] Dr. Simon's opinion was preceded by a full examination of all available records of Julene's healthcare. [485-457 ¶¶16-19]. On the basis of these opinions, Dr. Simon concluded that Fredline and the staff of St. Als. provided healthcare that fell below the standard of care. [R. 482-514].

### 3. Supplementation of Dr. Simon's Expert Opinions on Medical Malpractice.

Following the receipt of additional discovery from Defendants, Julene and Bill caused Dr. Simon to supplement his expert opinions to include analysis of those documents. [R. 1612-1648]. That supplementation did not modify the scope of opinions or change in any way Dr. Simon's opinions, contrary to the perplexing and nonsensical statements by the lower court that he had. Following Defendants' astonishing attempt to submit a declaration by Fredline in support of its defense [R. 1490-1599] and production of complete medical records for Julene's healthcare by St. Als during 2017, Defendants' deposed Fredline in a prefabricated series of scripted and leading questions on 6 December 2022. While time restrictions prevented Julene and Bill from cross-

examining Fredline, the deposition was adjourned. However, the St. Als. records and Fredline's self-serving testimony were promptly sent to Dr. Simon, who prepared a Second Supplemental Declaration. [R. 2571-2575] As before, this latest supplementation did not modify the scope of opinions or change in any way Dr. Simon's opinions, contrary to the perplexing and nonsensical statements by the lower court that he had. [R. 2572-2573 ¶¶2-5].

On or about 7 January 2023, Julene and Bill convened the cross-examination of Fredline and obtained testimony that concurred with Dr. Simon, inter alia, that the standard of care for hiatal hernias in Nampa, Idaho is the same as that universally followed in the rest of the American medical community. [R. 3325-3339] On 30 January 2023, Dr. Simon's Second Supplemental Expert Opinion Report. [R. 3325-3339] Dr. Simon's further supplementation folded in the balance of Fredline's testimony and Defendants' rebuttal expert disclosure. [R. 3325-3339] Once again, this latest supplementation did not modify the scope of opinions or change in any way Dr. Simon's opinions [R. 3325-3327 ¶¶2-4], contrary to the misguided statements by the lower court that he had.

The last day to complete fact discovery was set for 9 January 2023. [R. 130-137]

### 4.    Defendants' Rebuttal Expert Disclosure.

On or about 3 January 2023, Defendants submitted their rebuttal expert opinions, all of which sought to challenge Dr. Simon's superior expert testimony and failed to identify any facts or theories supporting the notion that Fredline and St. Als.' conduct met the applicable standard of care, and understandably so as to do so would be to open their opinions up to an indefensible challenge. [R. 2610 – 2667]. As stated above, Dr. Simon submitted a further supplementation deconstructing Defendants' experts and reaffirming the consistency and scope of his opinions, particularly since Defendants' rebuttal experts did not rebut any of the substantive and controlling opinions formed by Dr. Simon. [R. 3325-3327]

### 5.    Expert Opinions and Testimony of Rebecca E. Czarnik, R.N.

18

Under the lower court's 7 March 2022 Scheduling Order, the deadline for Julene and Bill to identify and disclose all expert witnesses expected to testify at trial and to submit a complete statement of all opinions to be expressed by said expert witnesses. On 3 November 2022 (approximately six months before the scheduled trial date), Julene and Bill filed an expert disclosure, designating Rebecca E. Czarnik, R.N. ("Becky") as their expert on direct damages. The 3 November 2022, disclosure indicated that a report of Becky's opinions was being prepared; stated the scope of her opinions; and identified clearly that her opinions would include damages, future and current medical and non-medical needs, costs, quality of life damages, and pain and suffering; listed the information Ms. Czarnik would consider in forming her opinions; and disclosed Becky's curriculum vitae and rate of compensation in compliance with the requirements of I.R.C.P. 26. Concurrent with this disclosure, Julene and Bill notified Defendants' counsel that it would gladly accommodate Defendants' rights to conduct discovery to permit a full rebuttal. On 23 December 2022, Appellants filed a second supplemental expert disclosure and attached Becky's expert report. The 43-page report identified extensive future medical care, medical procedures, diagnostic studies, therapy, medication, equipment, case management, evaluations, home care, home assistance, transportation, and surgeries that Julene would require in addition to her [Julene's] life expectancy and a range of damages. In response, Defendants filed a Motion *in Limine* seeking to exclude Becky's testimony. [R. 2377-2379, 2380-2383]. The arguments made in this paragraph were memorialized in Julene and Bill's opposition to Defendants' *Motion in Limine*. [R. 3417 – 3425].  Defendants' rebuttal expert disclosure deadline was 3 January 2023. Defendants failed to identify any experts on damages, either nominally or substantively. [R. 2610-2667] On 3 January 2023, Julene and Bill filed a motion to modify the lower court's Scheduling Order by extending Respondents' expert witness deadline. [R. 2576–2580] Julene and Bill filed this motion out of respect for Defendants' discovery rights, to give them time to cross-examine and/or respond to Becky's disclosures, and to ensure the

record was clear that Julene and Bill were not engaged in gamesmanship. [R. 2576–2580] As a further attempt to ensure neither party's rights would be prejudiced, on 2 March 2023, Julene and Bill filed a motion for relief from the scheduling order asking the Court to find that Ms. Czarnik's expert disclosures submitted after 4 November 2022, were proper supplementation, citing excusable neglect. [R. 3688 - 3693]

### 6.    13 February 2023 and 6 March 2023 Hearings

The majority of dispositive motions and evidentiary objections was heard by the lower court in a single hearing, convened on 13 February 2023. [Tr. 1-73] Given the dearth of pleadings filed (most of which, quantitatively-speaking, were Defendants' objections and motions to strike), Julene and Bill attempted to minimize the risk of confusion to the lower court by preparing and lodging a correlation table showing which submissions related to which motions and their posture (supporting or opposing). [R. 3660-3671] On April 3, 2023, was the last day to complete expert discovery. [R. 166-173]. Julene and Bill submitted timely and complete disclosures of Becky and Dr. Simon, containing the sake opinions and substantiating them with the same evidence. The deferment to, and consolidation of, all matters to 13 February 2023 and 6 March 2023 and should have given the lower court an opportunity to rule on all motions after both fact and expert discovery were concluded. Sadly, the lower court's written rulings, made on 14 April 2023, completely gutted Julene and Bill's motions and blindly granted all of Defendants' motions. [R. 4915-4983]

### II.    ISSUES PRESENTED ON APPEAL

For the sake of efficiency in the effort to conform the lower court's rulings to the governing law on each issue, this appeal is focused on those rulings (A) granting Defendants' Motion for Summary Judgment; (B) granting Defendants' Motion in Limine to Exclude Testimony of Rebecca

Czarnik; and (C) granting Defendants' Motions to Strike Expert Disclosures of Fred Simon, M.D.[3] The overarching problems endemic to the lower court's entire ruling are addressed vis-a-vis the court's (D) granting of Defendants' moot Motion for Protective Order and (E) cumulative disregard for both law and facts as indicative of judicial bias.

**A.    Orders on Parties' Motions for Summary Judgment.**

**1.**    Whether the lower court erred in determining that the doctrine of judicial estoppel did not bar Defendants' defense (that no medical malpractice occurred) after Defendants themselves filed a complaint for medical malpractice on Julene and Bill's behalf in the underlying action.

**2.**    Whether the lower court erred in granting Defendants' Motion for Summary Judgment on professional negligence and breach of contract.

**3.**    Whether the lower court erred in denying Julene and Bill's Motion for Partial Summary Judgment on Liability.

**B.    Order Granting Defendants' Motions to Strike Expert Testimony of Fred Simon, M.D.**

**1.**    Whether the lower court abused its discretion by granting Defendants' Motions to Strike the Expert Disclosure Reports of Fred Simon, M.D.

**2.**    Whether the lower court erred in refusing to acknowledge the ongoing obligation to supplement a party-litigant's expert disclosures under I.R.C.P. 26 and therefore consider the final disclosures, which were complete before the Court heard and ruled upon the Motions to Strike.

---

[3] The reversal of the rulings (A) through (C) will situate this matter for remand to the lower court and permit trial on the merits.

**C.      Order Granting Defendants' Motion in Limine to Exclude Expert Opinion and Testimony of Rebecca Czarnik**.

**1.**      Whether the Court's obsession with its own Scheduling Order in the face of clear legal authority constitutes an abuse of discretion.

**2.**      Whether the lower court abused its discretion by excluding the testimony of a timely disclosed expert witness more than six months prior to trial.

**D.      Due Process Issues**

**1.**      Whether the lower court's persistent disregard for the law, the evidence in the record, and the prevailing circumstances—demonstrated through its rulings on the foregoing motions—constitutes judicial bias.

**2.**      Whether the standard for determining the existence and nature of judicial bias currently followed in the State of Idaho violates a party-litigant's right to due process under the United States Constitution.

## III.      ARGUMENT

**A.      The Lower Court's Erred in Denying Plaintiff's Motion for Partial Summary Judgment and Grant of Defendants' Motion for Summary Judgment.**

The principal reason for reversing the lower court's rulings (denying Julene and Bill's Motion for Partial Summary Judgment and granting Defendants' own Motion for Summary Judgment) is the improper validation of Defendants' sole defense: that no medical malpractice existed and, if no medical malpractice existed then no legal malpractice arising from Defendants' representation could exist either. This theory is woven through Defendants' opposition to Julene and Bill's request for summary judgment and the voluminous objections to Julene and Bill's expert Dr. Fred Simon.  This theory is the central premise of the rebuttal opinions of Defendants' own designated experts. It is the reason for Defendants soliciting a sworn declaration, deposition

22

testimony, and expert designation of the very surgeon whose ineptitude nearly killed Julene and whom Defendants sued on Julene and Bill's behalf.

The lower court's acceptance of this position—the exact opposite position to that taken by Defendants on Julene and Bill's behalf—This theory is not only disingenuous in light of the facts but (more critically) contradicts a focused and unambiguous body of Idaho case law. *See infra*. Defendants solicited Julene and Bill claiming they had a case for medical malpractice. While this poorly chosen defense does not excuse Julene and Bill from carrying their burden of proof as to causation (namely the proverbial "case within a case" of medical malpractice), it limits the arguments Defendants could legitimately make in responding to Julene and Bill's claims. By attacking the very theory that they advocated on Julene and Bill's behalf and using that theory to bolster their every position in the lower court proceeding, Defendants have shot themselves in the foot. The problem, of course, is that the lower court ignored the plain legal authority by (inexplicably) endorsing this inapposite, and therefore meritless, defense. They signed an engagement letter with Julene and Bill, agreeing to pursue a claim for medical malpractice. [R. 549 ¶52, 1078, 521 ¶25, 545 ¶31, 978] They spent over two years presumably working on Julene and Bill's behalf before filing a pre-litigation panel petition with the Idaho Board of Medicine. [R. 549 ¶53, 1081] They then proceeded to file a civil complaint for medical malpractice. [R. 470-476] Defendants never told Julene or Bill that their claims were without merit, that there were legal or factual issues prohibiting those claims, and they never terminated representation. [R. 1272-1274 ¶¶32-34] By proactively filing the Complaint against St. Als and Fredline, Defendants certified (under I.R.C.P. 11) that the claims had merit, that they were not being filed for any improper purpose, and that the lawsuit had merit. By taking these steps, Defendants foreclosed any argument that no malpractice occurred. [R. 470-476]

23

Defendants both opposed Julene and Bill's Motion for Partial Summary Judgment and filed their own Motion for Summary Judgment using the argument that no medical malpractice ever occurred. Defining new depths of desperation, Defendants' expert designation of the very surgeon they' sued on Julene and Bill's confirms their reliance upon this theory. [R. 2610-2667] Moving forward to the proceedings before lower court, Defendants only lawful defense would be to henpeck the sufficiency of Julene and Bill's proof as to the element of causation (i.e., the proving of a case for medical malpractice within the context of the legal malpractice case). Their attempts to do so were eviscerated by Julene and Bill's expert, Dr. Simon. The most conservative outcome within judicial discretion would be to deny summary judgment to both parties and leave the issue for a jury. At its most liberal, the outcome would be granting Julene and Bill's Motion for Partial Summary Judgment and denying Defendants' Motion for Summary Judgment.

### 1.    Standard of Review

When this Court reviews a district court's ruling on a motion for summary judgment, it employs the same standard as the district court's original ruling on the motion. *Infanger v. City of Salmon*, 137 Idaho 45, 46–47, 44 P.3d 1100, 1101–02 (2002). In a motion for summary judgment, the moving party bears the burden of proving the absence of a material fact. *Sadid v. Idaho State University*, 151 Idaho 932, 938, 265 P.3d 1144, 1150 (2011) (citation omitted). "When considering whether the evidence in the record shows that there is no genuine issue of material fact, the trial court must liberally construe the facts, and draw all reasonable inferences, in favor of the nonmoving party." *Liberty Bankers Life Ins. Co. v. Witherspoon, Kelley, Davenport & Toole, P.S.*, 159 Idaho 679, 685, 365 P.3d 1033, 1040 (2016). Although circumstantial evidence can create a genuine issue for trial, a mere scintilla of evidence is insufficient to demonstrate the existence of a genuine issue of material fact. *Callies v. O'Neal*, 147 Idaho 841, 846, 216 P.3d 130, 165 (2009) (citation omitted). This Court reviews "only that portion of the record which was before the trial court at the time the

24

summary judgment motion was presented." *Brown v. Matthews Mortuary, Inc*., 118 Idaho 830, 833, 801 P.2d 37, 40 (1990). "If the evidence reveals no disputed issues of material fact, then only a question of law remains, over which this Court exercises free review." *Lapham v. Stewart*, 137 Idaho 582, 585, 51 P.3d 396, 399 (2002). Because Defendants' choice of defense organized all fact and expert discovery content according to the mantra that no medical malpractice existed, Defendants raised no disputes of fact. As such, only questions of law remain. The entirety of this dispute hinges upon the proper application of the doctrine of judicial estoppel. Its proper application necessitates a reversal of Defendants' Motion for Summary Judgment bars any further indulgence of Defendants' nonsensical oppositions to Julene and Bill's Motion for Partial Summary Judgment. This Court is therefore free to apply a logical, reasoned and principled review of the lower court's confused and chaotic decisions.

> **2.      The Lower Court Erred in the Extreme by Ignoring the Doctrine of Judicial Estoppel, Which Bars Respondents From Denying the Existence of Medical Malpractice.**

Defendants' entire theory of defense against Julene and Bills claims is, by virtue of the indisputable facts, wholly contrary to well-established law and is precisely the sort of defense that the doctrine of judicial estoppel exists to prohibit. This Court has ruled clearly and definitively against Defendants' theory of defense in this matter, and has barred such tactics under the doctrine of judicial estoppel:

> "…to avoid misapplication of judicial estoppel, it should be made clear that **the concept should only be applied when the party maintaining the inconsistent position either did have, or was chargeable with, full knowledge of the attendant facts prior to adopting the initial position**. Stated another way, the concept of judicial estoppel takes into account not only what a party states under oath in open court, but also what that party knew, or should have known, at the time the original position was adopted."

25

*Heinze v. Bauer*, 145 Idaho 232, 235-36, 178 P.3d 597, 600-01 (2008) (boldface emphasis added). This particular cluster of issues is neither nuanced nor complex: the law forbids Defendants from faithlessly playing both sides of the street and, by staking their defense of this action on a single theory that contradicts their own representations to Julene and Bill and to the judiciary, the application of judicial estoppel permits a reversal of all summary judgment rulings made by the lower court in defiance of the law. With this Court unshackled from the flawed rulings of the lower court a *de novo* review of the record will lead to three critical conclusions: (1) Defendants' positions, both in seeking summary judgment and opposing Julene and Bill's requests, hinge solely upon the assumption that no medical malpractice occurred; (2) Defendants' related attacks on Dr. Simon's expert opinions and their own rebuttal expert testimony reflects that assumption; and (3) the positions taken by Defendants across all summary judgment motions fall squarely within the ambit of judicial estoppel and therefore mandate a reversal of the rulings on those motions. Julene and Bill respectfully draw this Honorable Court's attention to the following undisputable facts in the record, each of which adds another brick to the wall that is judicial estoppel:

First, Defendants solicited Julene and Bill as clients, claiming that Fredline and St. Als were liable for the malpractice committed with respect to Julene. [R. 1265-1278, 1129-1136] After Julene and Bill formally engaged Defendants as counsel, Defendants (by their own sworn testimony) spent over two years carrying out lawyerly activities on Julene and Bill's behalf. [R. 1272 ¶32].

Second, Defendants' sworn deposition testimony and verified written discovery responses indicate their representation included consulting with other attorneys [R. 545 ¶31, 968, 977-978] and in consultative activities with "experts." [R. 545 ¶31, 968, 983]. While any competent attorney conversant in making medical malpractice claims would (presumably) have a pre-existing "stable" of experts available to opine on the suitability of Julene and Bill's claims and whether pursuing them was advisable, Defendant Jones chose instead to talk to friends and seemingly random physicians,

26

whom have since died. [R. 545 ¶31, 968, 983, 985]. Defendants' scant billings even indicate they contacted Dr. Fred Simon, the very expert that Julene and Bill retained in this action [R. 545 ¶29, 929, 944-945].

Third, Defendants filed a pre-litigation petition with the Idaho Board of Medicine after almost two years of representation. [R. 549 ¶53, 1081] While the competence of Defendants' work was noticeably deficient—even the pre-litigation panel convened by the Idaho Board of Medicine noted an absence of specificity regarding the allegations, which were drafted by Defendants [R. 549 ¶55, 1100, 1103]—the fact remains that Defendants unwaveringly maintained that medical malpractice had occurred.

Fourth, at no time did Defendants ever represent to Julene or Bill that their case lacked merit or that their [Defendants'] assessment was incorrect. [R. 1272-1274 ¶¶32-34] At no time did Defendants update Julene, suggest that a lawsuit should not be filed, recommend that Julene and Bill not proceed, or disclose potential risks. [R. 1271–1272 ¶¶ 26-32]. Similarly, at no point did Defendants to counsel Julene and Bill against pursuing a claim for malpractice, encourage them to seek the representation of other counsel, or so much as insinuate defects in the theory of recovery Defendants had used to solicit their business, or hedge in the most minimal way that the risks inherent to litigation may yield an adverse outcome. [R. 1272-1274 ¶¶32-34] In fact, upon receipt of the Idaho Board of Medicine's finding that no malpractice occurred, Defendant Jones wrote to Julene and urged her to "keep the faith." [R. 1273 ¶33].

Fifth, and as critical as any other undisputable fact, Defendants drafted a complaint for medical malpractice against Fredline and St. Als, and then filed that complaint with the Third District Court in and for Canyon County. [R. 460]. This action renders the applicability of judicial estoppel absolute. Defendant may have left an opening for an approach as cheap and faithless as that chosen in this matter had they not filed the complaint on Julene and Bill's behalf. Timeliness of

27

the complaint is similarly irrelevant: if the Defendants were consciously aware that the statute of limitations had expired at the time the complaint was filed, such reckless disregard for the law would only compound their malfeasance. Indeed, even in the context of legal malpractice and even when ruling in favor of the attorney (on other grounds), this Court has spoken clearly that the principle of judicial estoppel applies to precisely the same scenario as this matter:

> "For guidance purposes and to avoid misapplication of judicial estoppel, it should be made clear that the concept should only be applied when the party maintaining the inconsistent position either did have, or was chargeable with, full knowledge of the attendant facts prior to adopting the initial position. **Stated another way, the concept of judicial estoppel takes into account not only what a party states under oath in open court, but also what that party knew, or should have known, at the time the original position was adopted**. <u>Thus, the knowledge that the party possesses, or should have possessed, at the time the statement is made is determinative as to whether that person is "playing fast and loose" with the court</u>.
>
> The situation would also be different, for example, if an attorney committed malpractice by neglecting to include a defendant in the complaint. In that case, assuming that the client was not aware of the malpractice before agreeing to the settlement, the client may have a legal malpractice claim. The conduct giving rise to the legal malpractice claim, while potentially affecting the amount of the final settlement agreement, is not part and parcel of the settlement agreement. The client could still agree to the settlement while retaining the right to file a legal malpractice action."

*McKay v. Owens*, 130 Idaho 148, 155, 937 P.2d 1222, 1229 (1997) (boldface and underline emphasis added). Here, there is no basis for circumventing the applicability of this doctrine. Defendants were in full possession of the facts, regardless of whatever excuses they may proffer. They undertook to file suit for medical malpractice, fully aware of all relevant circumstances, and openly advocated against Fredline and St. Als. In context, this choice of defense do so is indicative of the depths of Defendants' shameful negligence that places Julene's lifelong injury, stemming from two incidences of professional incompetence, in such a deplorable light.  As the arguments in favor of reversing the

28

other horrific decisions rendered by the law court will demonstrate (*see infra*), the unpalatable truth for Defendants is that Julene and Bill have done a better job of proving the existence of medical malpractice in the context of this legal malpractice action in the space of one year than Defendants were ever able to do with over two years of opportunity.

**B.      Defendants' Failure to Carry Their Burden of Proof as the Party Moving for Summary Judgment Mirrors Their Failure to Demonstrate the Opposite When Opposing Plaintiff's Motion for Partial Summary Judgment.**

This is not a case involving subtleties of fact upon which reasonable and intelligent minds could differ. Defendants have chosen to take the position that no medical malpractice exists. In so doing, their objections to Julene and Bill's Motion for Partial Summary Judgment—notably the strength of Dr. Simon's expert opinions—are as factually wrong as they are illegitimate:

Defendants failed to meet their burden of demonstrating the existence of a triable issue of material fact. Julene and Bill's MPSJ was based upon first-hand knowledge and the opinion testimony of their designated expert: a respected surgeon with four decades of experience in the specific area of medicine relevant to this case, including over thirty years' practice throughout Idaho. In stark contrast, Defendants' response was predicated upon the exact opposite of the position taken on Plaintiffs' behalf in the underlying action and is "supported" by the self-serving deposition testimony of Fredline, whose testimony violates the prohibitions on examination in Idaho Rule of Evidence 602 and a poorly reasoned attempt to exclude Dr. Simon's declaration. The substantive core of the issue is, as usually is the case, with the element of causation. This is where Dr. Simon's testimony is brought to bear and merits consideration in the following ways:

First, Dr. Simon's original and supplemental expert opinions (rendered at the time Julene and Bill's MPSJ was briefed and at all times thereafter) do not waiver in their identification and explanation of why the healthcare provided to Julene fell below the local standard of care. In

29

response, Defendants resort (in desperation) to the self-interested testimony of the same surgeon whose conduct lies at the heart of the issue of cause: Fredline. While the submissions of every party-litigant, by their nature, require some "self-interest," a party is not allowed the indulgence of testimony that is so inexorably biased that it is devoid of probative truth. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S. Ct. 2505, 2517 (1986). Under Idaho law, to be admissible in a medical malpractice action, expert testimony must demonstrate the expert's familiarity with the applicable standard of care for a particular profession for the relevant community and time, and the proponent must show the basis for the expert's knowledge. *Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 51, 995 P.2d 816, 821 (2000). This Court has ruled that the "key to admission of an expert's opinion is the validity of the expert's reasoning and methodology. The court's function is to distinguish scientifically sound reasoning from that of the self-validating expert, who uses scientific terminology to present unsubstantiated personal beliefs." *State v. Konechny*, 134 Idaho 410, 412, 3 P.3d 535, 537 (Ct. App. 2000). In the present case, Fredline's testimony is nothing more than an exercise in self-justification by a defendant in the underlying case. Fredline's bias and self-interest alone in deeming himself free of any fault is in itself fatal. This Court is obligated to "distinguish scientifically sound reasoning from that of the self-validating expert, who uses scientific terminology to present unsubstantiated personal beliefs," it may not "substitute its judgment for that of the relevant scientific community." *Coombs v. Curnow*, 148 Idaho 129, 140-41, 219 P.3d 452, 464-65 (2009). Further relevant considerations require determining whether the basis of an "expert" opinion is scientifically valid. This include "whether the theory can be tested and whether it has been subjected to peer-review and publication." *Weeks v. E. Idaho Health Servs.*, 143 Idaho 834, 838, 153 P.3d 1180, 1184 (2007); *see also Daubert v. Merrell Dow Pharms..*, 509 U.S. 579, 589, 113 S. Ct. 2786, 2796 (1993). At no point

30

in Fredline's testimony is there any factual indicia or epistemological bases for these statements, nor is there any basis identified to demonstrate why the actions taken were medically sound. The tone and approach of Fredline's testimony infers that the local standard of care justifies the outcome that Julene experienced. In fact, the local standard of care has roots elsewhere and Fredline's conduct itself fell below that standard as confirmed by superior medical opinion in the unbiased shape of Dr. Simon indicates otherwise. Fredline's testimony fails these tests on its face. [R. 1612–1648, 2571–2575, 3325–3339]

Second, Dr. Simon's expert submissions clearly stated where the local standard of care was most actionably violated. In comparison, Fredline's deposition—notably on the issues that constitute the gravamen of this action, relating to the standard of care and whether the care provided to Julene met that standard—consisted of Defendants' counsel testifying and Fredline affirming counsel's statements. The use of leading questions are limited to examination of adverse witnesses. *See* Idaho Rule of Evidence 602. Defendants have designated Fredline as their expert witness. On direct examination, leading questions are not allowed, except in the sound discretion of the court, under special circumstances, making it appear that the interests of justice require it. *Viehweg v. Thompson*, 103 Idaho 265, 270, 647 P.2d 311, 316 (Ct. App. 1982) (citing I.R.C.P. 43(b)(2)). "[The] most important circumstance for consideration [of whether a question is leading] is the extent of the particularity of the question itself." *See id.* (citing McCormick on Evidence). This Court's review of the Fredline deposition shows the examination is nothing more than an exercise prefabricated and scripted theatre.

Third, Fredline's testimony does not provide the factual assumptions upon which the standard of care he purports his conduct upholds. Again, his testimony is a scripted exercise whereby Defendants' counsel reads a lengthy series of self-serving and conclusory statements onto the record, Fredline immediately responds with a one-word response (usually "yes"), and isolated medical

31

records are introduced to create a façade of legitimacy. Moreover, as to their weight: expert opinions that are speculative, conclusory, or unsubstantiated by facts in the record is of no assistance to the jury in rendering its verdict, and therefore is inadmissible. I.R.E. 702; *Coombs*, 148 Idaho at 140, 219 P.3d at 464. In significant contrast, Dr. Simon identifies the sequence of events leading up to Julene's ultimate injuries. Fredline's testimony, if anything, identifies new incidences of malpractice in terms of how the original surgery was performed and the disparity between Julene's status as a patient and the care provided to her relevant to that condition. Indeed, Dr. Simon's analysis of that testimony affirms his original opinion: that Fredline's conduct fell below the standard of care. [R. at 2571–2575] Fredline's testimony led to a decision by the lower court that opposed a finding of malpractice in the underlying matter. The lower court would have, at the very least, rendered a properly informed decision had it read, understood and weighed the opinions of Dr. Simon. This true becomes even more apparently when both Dr. Simon and (after being pressed by the undersigned counsel on cross-examination) Fredline confirmed that the standard of care in the procedure at issue does not vary between Nampa, Idaho and the broader medical community in the State of Idaho and the rest of the United States. [R. at 2571–2575]. The exasperation caused by the lower court's sheer avoidance of these fundamental undisputed facts cannot be understated.

C.    **The Lower Court Erred by Denying Julene and Bill's Motion for Summary Judgment as to Breach of Contract.**

The same standard applicable to summary judgment rulings cited above (*see* Section III(A)(1), *supra*) applies to the review of the lower court's granting of Defendant's Motion for Summary Judgment. "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, . . . or [by] showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." I.R.C.P. 56(c)(1). Thus, "the party opposing summary judgment must bring to the trial court's attention evidence that may

32

create a genuine issue of material fact . . . ." *Beus v. Beus*, 151 Idaho 235, 239, 254 P.3d 1231, 1235 (2011) (citing *Esser Electric v. Lost River Ballistics Tech., Inc*., 145 Idaho 912, 919, 188 P.3d 854, 861 (2008)). "When considering evidence presented in support of or opposition to a motion for summary judgment, a court can only consider material which would be admissible at trial." *Venable v. Internet Auto Rent & Sales, Inc*., 156 Idaho 574, 580, 329 P.3d 356, 362 (2014) (quoting *Gem State Ins. Co. v. Hutchiso*n, 145 Idaho 10, 14, 175 P.3d 172, 176 (2007)).

> Given these standards, summary judgment is improper "if reasonable persons could reach differing conclusions or draw conflicting inferences from the evidence presented." *McPheters v. Maile*, 138 Idaho 391, 394, 64 P.3d 317, 320 (2003). However, a "mere scintilla of evidence or only slight doubt as to the facts is not sufficient to create a genuine issue of material fact for the purposes of summary judgment." *Van v. Portneuf Med. Ctr.*, 147 Idaho 552, 556, 212 P.3d 982, 986 (2009).

*La Bella Vita, LLC v. Shuler*, 158 Idaho 799, 805, 353 P.3d 420, 426 (2015).

**D.    The Lower Court Grossly Abused its Discretion by Granting Defendants' Motion *in Limine*, Excluding the Testimony of Rebecca Czarnik, R.N.**

The lower court's treatment of Defendants' Motion in Limine—seeking the exclusion of the expert testimony of Rebecca Czarnik, R.N., disclosed by Julene and Bill to substantiate their actual damages—continues the astounding theme that defines its 14 April Rulings.

As stated above, Becky was disclosed as an expert on the deadline set forth in the Scheduling Order. [R. 3417-3425] Due to a family tragedy, Becky was not able to provide a full expert opinion report concurrent with the disclosure of her status as an expert. [R. 3417-3425, 3472-3521] Through counsel, Julene and Bill proactively notified them of this issue and offered to make concessions to avoid prejudice. [R. 3417-3425, 3472-3521] Whether in a fit of inexperience, intimidation or some other influence, the lower court made a series of observations about scheduling and opportunity that ring hollow in comparison to other, contradictory, decisions elsewhere in the ruling. Regardless, the

33

facts and circumstances surrounding this issue demonstrate that the lower court abused its discretion in making the findings it made.

### 1.      Standard of Review

Motions in limine "excluding broad categories of evidence are disfavored, as such issues are more fairly dealt with during trial as the admissibility of evidence arises. *Rush v. Weinstein*, 2022 U.S.Dist. LEXIS 72155, 3 (2022). However, "[t]rial courts have broad discretion when ruling on a motion *in limine*." *Gunter v. Murphy's Lounge L.L.C.*, 141 Idaho 16, 25 (2005). That discretion, however, is not unaccountable: an appellate court reviews a trial court's decision to grant a motion *in limine* under an abuse of discretion standard.  *Id.*  If a reviewing court determines that a trial court did abuse its discretion in making an evidentiary ruling, the ruling will be overturned on appeal if "the admission or exclusion of evidence affected a substantial right of the party." *Hansen v. Roberts*, 154 Idaho 469, 472 (2013).

### 2.      The Lower Court's Order *in Limine* Fails to Meet Pass Even the Minimal Scrutiny Applied to Matters of Discretion.

The paramount importance of Becky's opinions and testimony and the fullness of their disclosure, compounded by the substance and character of the lower court's rulings, demands a granular deconstruction of that ruling. Consequently, when considering a decision governed by the "abuse of discretion" standard, this Honorable Court must apply a four-factor test to determine whether the lower court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863 (2018).

#### (a)      The Lower Court Did Perceive the Evidentiary Issue of Becky's Opinions and Testimony as a Matter Within its Discretion.

Julene and Bill do not dispute that orders *in limine* are matters of discretion. Whether evidence should be admitted is a well-examined question of discretion. *State v. Le Veque*, 164 Idaho 110, 115 (2018); *Cramer v. Slater*, 146 Idaho 868, 878 (2009). Judicial inexperience aside, the lower court's ruling indicates its perception of the matter as within its discretion. What Julene and Bill (rightly) contest is the manner in which the lower court exercised that discretion.

### (b)    The Lower Court Did Act Within the Boundaries of its Discretion.

"A district court fails to recognize the outer bounds of its discretion if it fails to state or apply the correct legal standard." *Brauner v. AHC of Boise, LLC*, 166 Idaho 398, 409 (2020). The lower court recognized its ability to make evidentiary rulings and issue orders reflecting those determinations. Again, the dispute at issue is the proper treatment of the adjudicatory process the lower court is entrusted with making.

### (c)    The Lower Court Did Not Apply the Law.

"[A] lower court's failure to articulate and apply the relevant legal standard is an abuse of discretion." *Mortensen v. Baker*, 170 Idaho 744, 756 (2022). Two discreet but related sets of legal considerations apply here: the first concerning the relevance and probity of the evidence from an admissibility standpoint, and the second concerning the circumstances under which the evidence is presented, which in the present are the nature and timing of the expert disclosure.

### (1)    Becky's Opinions Meet All Admissibility Requirements.

With respect to the first set of consideration (governing admissibility) determining if expert testimony should be allowed requires a trial court to consider if the testimony is relevant as a threshold consideration under I.R.E. 402. The evidentiary value of Becky's testimony is not a disputed matter. The element of damages requires the testimony of an expert conversant in the types of injuries that Julene had suffered. Another key issue that the court looks at to determine if expert testimony is appropriate is whether or not the testimony will help the trier of fact understand an

issue in the case better.  I.R.E. 702.  "A witness who is qualified as an expert by knowledge, skill, expertise, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  *Id.*  While the cost of care to date is quantifiable by reference to the health care billing, specialized knowledge of life planning and costing is required for what lies ahead in Julene's life, such as future care, organ transplants and related procedures. Becky's expert opinions are germane to an itemization of what those damages are, why they are relevant, and what their financial cost will be. [R. 3417-3425, 3472-3521] It should be noted that the $8 million figure is a direct damages calculation and does not take into account pain and suffering or other damages that Julene and Bill would potentially be awarded by the trier of fact. [R. 2386 - 2474] Next, expert witnesses must be disclosed to the opposing party during discovery.  I.R.C.P. 26(b)(4).  Additionally, "a party must supplement in a timely manner the identity of each person expected to be called as an expert witness at trial, the subject matter on which the person is expected to testify, and the substance of the person's testimony," after discovery is closed.  I.R.C.P. 26(e)(2). Under I.R.C.P. 26(e)(3), if a witness is not supplementally disclosed, the court may exclude the testimony.

### (2)    The Circumstances Under Which Becky's Opinions Were Disclosed Meet All Requirements to be Admitted.

With respect to the second set of considerations (the manner in which Becky's expert opinions were disclosed), the lower court was obligated to consider the multiplicity of factors that were clearly briefed in opposition to Defendants' Motion *in Limine*. Instead, the lower court's ruling summarily excluded the disclosures, declaring (with neither reasoning nor legal authority) that:

> "[a]lthough Plaintiffs claim that they did not disclose Ms. Czarnik's opinions sooner because Ms. Czarnik experienced a death in her family, Plaintiffs have not provided the Court with sufficient information to determine whether there was a legitimate

36

reason or excusable neglect as to why they did not offer these new opinions by November 4, 2022."

[R. 4931-4936]. It is unclear what manner of graphic explanation or dissection of human grief the lower court expected Julene and Bill to put on display for the lower court's prurient curiosity: the "legitimate reason" is that Becky's mother died and this tragedy created a understandable interruption in the flow of her professional output, thereby precluding the completion of her full report of expert opinions! Even still, the absence of any cogent analysis by the lower court confirms that its order *in limine* is an abuse of its discretion. This contrast, between Julene and Bill's well-cited and reasoned submissions and the lower court's unsupported and unreasoned exclusion of Becky's opinions, is thus properly analyzed under the following set of considerations:

One, the lower court is not permitted to strike testimony because a scheduling order deadline was only partially complied with, when doing so essentially amounts to a judgment against the offending party. In *Roe v. Doe*, the Idaho Court of Appeals ruled that sanctions that kept a party from presenting evidence on a crucial issue was essentially the same as ruling against the party as to those issues:

> "Precluding a litigant from presenting evidence on crucial issues prevents a thorough examination of the merits at trial and in many circumstances will be tantamount to ordering judgment against the litigant on those issues. Some balancing of the equities and some consideration of the efficacy of lesser sanctions must precede a trial court's imposition of a sanction which will significantly impair a party's ability to present its case on the merits at trial."

*Roe v. Doe*, 129 Idaho 663, 667–68 (Ct. App. 1996). Here, the exclusion of Becky's testimony would foreclose Julene and Bill's ability to present proof of future damages in the case and impair the fundamental offer of proof. Excluding such a monumentally significant body of evidence because the expert in question endured a family tragedy, even after Julene and Bill's proactive attempts to

37

eliminate any prejudice caused by such a delay—runs contrary to all established law on this issue, to say nothing of the lower court's prejudice toward Julene and Bill.

Two, the balancing test discussed in *Roe* obligates the lower court to "balance the equities by comparing the culpability of the disobedient party with the resulting prejudice to the innocent party in light of the twin aims of the sanction power [encouraging compliance with discovery and punishing misconduct]. Only after applying this balancing test, the court should impose a sanction which will most substantially lead to the efficient administration of justice." *Southern Idaho Production Credit Association v. Astorquia*, 113 Idaho 526, 532 (1996) (Donaldson, J., concurring). In short, Julene and Bill cited the facts and circumstances specifying the reasons for the staggered disclosure and a substantial body of controlling law demanding (at the very least) a consideration of the foregoing factors. Instead, the lower court, by failing to articulate reasons of its own, implicitly ignored both the facts and the law. This myopia is, as this Honorable Court has discerned over the preceding forty pages of briefing, a persistent and highly suspect problem.

Finally, even if an expert witness is not disclosed, though, the court still has the discretion to allow their testimony. "The 'may' in Rule 26 gives the trial court the ability to weigh the prejudice of undisclosed testimony versus the value of the testimony," and allow it if it proves more valuable than prejudicial. *Zylstra v. State*, 157 Idaho 457, 466 (2014). Furthermore, an expert witness undisclosed until after the close of discovery may be allowed if good cause exists for the delay in disclosure. *Id*. at 467.

> **(d)** **The Lower Court Failed to Make a Reasoned Decision, Both as a Matter of Law and as a Matter of Proof.**

It is entirely understandable that Defendants would fight tooth and nail to exclude the opinion of an expert that states they are liable for a minimum of $8 million in direct damages. However, risk of liability is not the legal standard applicable to deciding a motion in limine, yet the

38

lower court gave no indication that it was following any principle other than that. In the present case, the lower court considered no lesser sanctions, reached a conclusion that in no way was supported by the record, and did nothing to show consideration of lesser sanctions. Instead, the lower court ignored Julene and Bill's methodical and careful compliance with the governing law by offering to accommodate Defendants' need to conduct discovery, by appealing to the basic humanity that (while not controlling) factors into the balancing process and by the undersigned seeking modification of the Scheduling Order on the basis of excusable neglect. [R. 3688–3693] The lower court balanced nothing, engaged in no discernable analysis or provide reasoning to contradict the legal authority cited by Julene and Bill. Treating its Scheduling Order as the Word of God rather than applying a modicum of reason in unforeseen circumstances, as the clear caselaw on point acknowledges, is proof of this obstinance. Becky's mother died and she was not able to include a full expert opinion report with Julene and Bill's otherwise timely and complete disclosures. [R. 3472–3521] To address this, Julene and Bill disclosed the substance of her opinions, timely summarized the specific opinions Becky would make [R. 2386 - 2474], noted explicitly that a formal opinion report would be forthcoming [R. 2386-2474], and notified Defendants of their willingness to accommodate their need for discovery before providing rebuttal testimony. [R. 3426-3471] Julene and Bill do not submit that laxity should be excused on grounds of equity. There was no laxity. Someone's mother died and the Court, in a bluster of authority, ignored the body of caselaw requiring a more nuanced and practical approach. Even if the initial expert report Becky provided was not admissible, a similar report (with the addition of a reply to Defendants' own experts) was timely and fully made on the deadline for Julene and Bill to submit reply expert disclosures. [R. 3697-3819].

> **(e)    The Lower Court Absolutely Failed to Reach its Decision by the Exercise of Reason.**

39

This Court reviews the process that the lower court went through in making its decision. *Le Veque*, *supra*, 164 Idaho at 115 (quoting *Palmer v. Spain*, 138 Idaho 798, 801 (2003)).  The most telling acknowledgment reflected in Idaho case law is that a discretionary decision not reached through an exercise of reason can be spotted because of its arbitrary nature. *Id*., at 115.

There are several ways in which the lower court can satisfy the element of the four-part test for abuse of discretion are by acting consistently with the facts presented to it, acting consistently with the applicable law, and hearing "a wealth of evidence."  Here, the lower court failed to make any coherent ruling that indicates compliance with this factor. Instead, its ruling ignored the significance of the evidence, its probative value, the unforeseen circumstances delaying the disclosure of her full opinion report [R. 3417-3425], and the fact that the full disclosure was made six months prior to trial along with an offer to accommodate any discovery that Defendants wished to conduct. [R. 3417-3425] Instead, Defendants bet that Under the circumstances, the lower court was provided a full and transparent disclosure of the circumstances surrounding the disclosure and supplementation of Becky's expert testimony.

### E.	The Lower Court's Grant of Defendants' Motion to Strike Dr. Simon's Expert Disclosures Displays a Shocking Failure to Follow the Law and Apply the Facts.

The lower court's rulings on Dr. Simon's expert opinions and the related disclosures are based upon a series of fundamental misunderstandings compounded by a failure to apply the law and reason to a decision. Based upon the same standard of care governing the lower court's treatment of Becky's testimony applies to Dr. Simon's Testimony. Consequently, a competent analysis on appeal requires discussion of the flawed understanding displayed by the lower court followed by the requirements that a party-litigant supplement their expert disclosures voluntarily, which Julene and Bill did repeatedly, and which Defendants did not do at all.

**1.     The Lower Court's Rulings Fails to Acknowledge that a Party-Litigant Has an Ongoing Duty to Supplement Their Expert Opinion**.

The lower court ruled that Dr. Simon's original 4 October 2022 declaration and supplemental declaration of 19 November 2022, did not violate the scheduling order, but did lack foundation. The lower court further ruled that Dr. Simon's second supplemental declaration of 30 December 2022, did violate the scheduling order because it disclosed new opinions. [R. 4943] There were no new opinions. In fact, the report explicitly stated why the supplementation had been made: the disclosure of new documents. The sole opinion of Dr. Simon was that the healthcare rendered to Julene fell below the applicable standard of care in the community where that care was rendered. Moreover, the lower court struck the second supplemental declaration of Dr. Simon stating: "Plaintiffs offer no legitimate reason why they did not offer Dr. Simon's new opinions by 4 November 2022. Additionally, Plaintiffs' failure was not harmless, particularly when coupled with the fact that they were disclosed a mere four days before Defendants' expert disclosures were due, and while the parties were engaged in extensive briefing on several motions before the Court." [R. 4943-4944] Again, not only were no new opinions disclosed, the lower court completely fails to acknowledge the ongoing obligation of a party-litigant to supplement their expert witness disclosures throughout the course of the litigation mandated by I.R.C.P. 26(e)(2).

**2.     The Lower Court Abused its Discretion in Striking Dr. Simon's Expert Disclosures.**

**(a)     The Lower Court Did Perceive the Evidentiary Issue of Becky's Opinions and Testimony as a Matter Within its Discretion**.

As with Becky, Julene and Bill do not dispute that orders striking evidence are akin to motions in limine and thus subject to the lower court properly exercising its discretion. Whether evidence should be admitted is a well-examined question of discretion. *State v. Le Veque*, 164 Idaho 110, 115 (2018); *Cramer v. Slater*, 146 Idaho 868, 878 (2009). Judicial inexperience aside, the lower

41

court's ruling indicates its perception of the matter as within its discretion. What Julene and Bill (rightly) contest is the manner in which the lower court exercised that discretion.

### (b)    The Lower Court Did Act Within the Boundaries of its Discretion.

As stated above, "[a] district court fails to recognize the outer bounds of its discretion if it fails to state or apply the correct legal standard." *Brauner*, *supra*, 166 Idaho 409. The lower court's exposition on the subject matter of Dr. Simon's opinions (regardless of how factually incorrect and legally deficient that exposition was/is) demonstrates an awareness of the ability to make evidentiary rulings and issue orders reflecting those determinations. Once again, the dispute at issue is the proper treatment of the adjudicatory process the lower court is entrusted with making.

### (c)    The Lower Court Failed in the Most Complete Terms to Follow the Law Governing Expert Witness Discovery and The Obligation of Ongoing Disclosure.

Separate from the conclusion reached, the lower court's ruling failed to apply the law in any cognizable way. Instead, a factually incorrect narrative of the expert disclosures of Dr. Simon was made, followed by a summary conclusion that those opinions either lacked foundation or were procedurally defective. Two fundamental problems exist with the lower court's failure to apply the law exist: the first problem is a critical failure to understand that every disclosure and supplemental submission of Dr. Simon was premised on a single, unchanging opinion: that St. Als and Fredline's health care failed to meet the standard of care in the community where it was provided; and the second problem is the lower court's (inexplicable) refusal to acknowledge that Julene and Bill had an ongoing obligation to supplement their expert witness disclosures under I.R.C.P. 26(e)(2).

### (1)    The Lower Court's Failure to Comprehend the Substance or Purpose of the Dr. Simon's Disclosures and Demonstrates a Wholesale Failure to Understand the Plain Language of the Disclosures

This Court is urged to remember a critical truth that the lower court (inexplicably) forgot or chose to disregard: Dr. Simon's repeated supplementations correlate to the ongoing fact discovery disclosures that occurred: as soon as Defendants' piecemeal disclosures were received, they were shipped off to Dr. Simon for analysis and the issuance of a supplementation of his expert opinions. [R. 2571-2575] When St. Als finally submitted a complete set of medical records, they were made available to Dr. Doble for inclusion in a supplemental opinion report. [R. 2571-2575] When Defendants deposed Fredline, the transcript of his testimony was expedited to Dr. Simon for analysis and deconstruction. [R. 2571-2575] When Dr. Fredline was cross-examined by the undersigned counsel, the same process of review and supplementation occurred [R. 3325-3339] when Defendants served their rebuttal expert disclosures. [R. 2610-2667] The chronology of the lower court proceedings (*see supra*) unambiguously confirms this. Throughout these supplementations, there have been no new opinions formed beyond those identified in the preliminary disclosures. At no time did Dr. Simon deviate from the opinion that St. Als and Fredline failed to provide healthcare consistent with the applicable standard of care. [R. 3325-3327 ¶¶2-4]

The lower court's 14 April Ruling makes a bizarre series of alternating assessments regarding the sequence of Dr. Simon's supplementations, appearing to claim some lack foundation and others are procedurally defective/untimely.  Neither of these findings are accurate. Every supplementation identified the reason why the supplementation was necessary. Every supplementation was filed on or before the deadline for doing so. Moreover, the reasons stated for the supplementation reflect the ongoing obligations of disclosure and supplementation imposed by I.R.C.P. 26(e). To point out the degree of indefensibility in the lower court's reasoning by flip-flopping between compliance and foundation of Dr. Simon's expert opinions. This Court's ruling in *Radmer v. Ford Motor Co.*, 120 Idaho 86, 813 P.2d 897 (1991), held that a district court erred when it allowed testimony from an expert witness despite the party's failure to supplement its discovery

responses before trial to reveal the expert's new theory of liability for an automobile accident, which prevented the manufacturer's ability to effectively challenge the new theory. This obligation to supplement is fundament. *See also* Angelo Rosa Idaho Practice: Pre-Trial Civil Procedure § 8.10[1][a] 2023 ed. (LexisNexis Publishing). In this case, the lower court demonstrates the inverse of this: that because opinions were supplemented, they should be stricken. Further proof of this improper reasoning is the lower court's treatment of a 30 January 2023 supplementation of Dr. Simon's opinions, Appellants filed the second supplemental expert opinion of Dr. Simon in which he "'reaffirm[s]' his previous opinions and 'respond[s] to and rebut[s] the testimony of Forrest Fredline, D.O.' made on behalf of" Appellees. [R. 3325-3339] For the purposes of using the second supplemental opinion in its case in chief, The lower court ruled that the opinion was in violation of the scheduling order and offered new opinions and thus excluded the testimony. Again, no new opinions were rendered, only an elaboration of the existing theory that included the evisceration of the improperly designated expert Forrest Fredline and the late arriving medical records file. The fact that the court could not discern the difference between a further affirmation of the same expert opinion.

### (2)    Dr. Simon's Supplementations Identified the Foundation of their Content (All of Which Was in Defendants' Possession or Were Produced by Defendants) and Honored I.R.C.P. 26(e)(2).

The lower court further ruled that Dr. Simon's remaining testimony lacked foundation. As its reasoning, The lower court stated that Dr. Simon did not demonstrate that he was familiar with the standard of care in Nampa, Idaho, the community where Mrs. Dodd's hernia surgery and postoperative care took place because Dr. Simon did "not adequately explain *how* he became familiar with the standard of care in Nampa, Idaho for either general surgeons or those who provided Mrs. Dodd's postoperative care." (*Id.* pg. 32–33.) The lower court further reasoned that Dr. Simon did not demonstrate that he possessed professional knowledge and expertise about the standard of

care applicable to hospitals or any other non-physician hospital personnel. (*Id.* pg. 36.). Again, Dr. Simon identified the basis of his local familiarity, despite the fact both Dr. Simon and the surgeon who was the Defendant in the underlying medical malpractice case testified that the standard of care applicable to the hiatal hernia procedure performed on Julene was no different from the national standard of care. This is therefore an illusory argument where the substance of Dr. Simon's opinion is concerned. As for disclosure of facts confirming that Dr. Simon (who has been practicing in Idaho for four decades) was familiar with the community standard (obtained through consulting with a local Nampa surgeon).

**(d)    The Lower Court Failed to Apply Principles of Law to the Correct Facts and Reach a Defensible Conclusion**.

The lower court's failure to comprehend Dr. Simon's disclosures as an identical set of opinions that was unchanged from first to last disclosure, and failure to recognize Julene and Bill's obligations to supplement Dr. Simon's expert disclosures reflects the defects in reasoning. Moreover, the following components of the lower court's rulings further confirm its failure to properly reason through the issues.

Moreover, the lower court's reliance upon the *Easterling* case is misplaced. In *Easterling*, the issue is with excluding expert testimony after a supplementation indicated that the expert would be testifying as to causation, an issue they had not previously disclosed by the disclosure deadline. The lower court likened this to essentially introducing a new witness after the deadline rather than supplementing the testimony of an existing witness. *Easterling v. Kendall*, 159 Idaho 902, 910 (2016). This ruling is, as usual, fallacious. Dr. Simon was not testifying as to totally new subject matter in the second supplemental opinion, or any other supplementation. As the language of the disclosures and supplementations consistently state and document, he was still testifying as to the standard of care and how Julene's procedures and care should have been performed. It seems as if lower court was punishing Appellants for following I.R.C.P. 26(e)(2) and supplementing expert

45

witnesses' testimony. While not surprising in the overall context of the lower court's 14 April 2023 Rulings, its reasoning demonstrates the same twisted failure to follow the law, to balance the hardships and to reach a logical and informed conclusion. Dr. Simon's supplementation cannot be likened to that in *Easterling* because he did not state (in the 30 December 30 supplemental declaration) that he would be testifying about anything new.  He merely responded to additional disclosures by Defendants that he could not have spoken to before. Again, failing to accurately interpret the language of a clearly-written set of expert disclosures and supplementations and failing to apply I.R.C.P. 26(e)(2) is sufficient basis to determine that the exclusion of Dr. Simon's fundamentally central expert testimony is beyond ample indicia of a hideous abuse of the lower court's discretion. The lower court's very statement: "[t]he Court agrees that in striking Dr. Simon's declarations, the Dodds cannot show that they have 'some chance of success' in the underlying medical malpractice action," should have precluded the lower court from striking the declarations in the first place or at the very least the court should have conducted the balancing test. The problem with this is that had a balancing test been properly conducted, the Simon opinions would have been admitted and the law would have been followed. This vignette is emblematic of the lower court's selective application of the law and use of its judicial initiative. This is the same species of adjudication that the lower court excused Defendants' failure to properly remedy its own failure to compel responses in its 14 April Rulings, yet when sent an informal letter requesting that Judge Yee-Wallace vacate her Order granting Defendants' (moot) Motion to Compel, she did nothing. [R. 3325-3339] This example is representative of the contrasting treatment of two similar issues: one that lacks merit and another that is completely merited. While an isolated example can be chalked up to judicial discretion or even harmless error, this mindset defines the lower court's treatment of issues in this case: wholly in Defendants' favor when their position is absolutely wrong as a matter of law and fact and against Julene and Bill despite the legal validity of their requests.

**F.      The Nature of the Lower Court's Rulings and the Absence of Cogent Reasoning in Making Those Rulings Raises the Inevitable Question of How Could the Lower Court Get So Much So Wrong.**

Regardless of the facts in a case, a ruling such as that rendered by the lower court in this matter contrasts with what is expected from a court. The lack of regard for the law and the incoherent reasoning displayed in the 14 April Rulings is, again, shocking. Those who have reviewed the pleadings and the lower court's rulings all reach the same conclusion: something is fundamentally wrong. The undersigned is fully aware of the solemnity of the issues addressed in this section and therefore does not raise them lightly. Moreover, no accusations of personal malice or corruption can be made in the absence of evidence directly establishing the same. Nevertheless, when comparing the submissions of the parties and prevailing law to the lower court's 14 April 2023 rulings, a practical question arises: how can a court depart so completely from the established law and the indisputable facts to make, instead, a ruling that ignores the law and summarily reasons unilaterally in favor of Defendants and expect to remain protected by the cover of judicial discretion? Given the fact pattern of legal malpractice, where the most appalling negligence has occurred in a community where the defendants are prominent local attorneys and there is a generally close relationship between bench and bar, the capacity for judicial bias in favor of attorney-defendants accused of malpractice is inescapable.

**1.      Standard for Judicial Bias: Idaho Supreme Court v. United States Supreme Court.**

In determining whether judicial bias exists, the United States Supreme Court has framed the standard by asking "not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016) (citations omitted). In stark contrast, this Honorable Court frames the standard for judicial bias in that "unless

47

there is a demonstration of pervasive bias derived either from an extrajudicial source or facts and events occurring at trial, there is no basis for judicial recusal." *Bach v. Bagley*, 148 Idaho 784, 792 (2010) (citations omitted). Unlike the Supreme Court's ruling in *Williams*, the Idaho Supreme Court has held that judicial disqualification is only required in "three instances which as an objective matter, require recusal under the Due Process Clause. These are circumstances in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable. These circumstances include: (1) instances where the judge has a financial interest in the outcome of the case; (2) the situation where a judge charges a defendant with criminal contempt and then proceeds to try him on the charge; and (3) cases where a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case." This narrow definition of bias leaves an improperly large number of circumstances where bias can be exercised without consequence. Indeed, there have been no findings supporting judicial disqualification for bias in the body of reported caselaw and those cases that do address the issue are devoid of any adverse consequences for judges. See, e.g., *Bach v. Bagley*, 148 Idaho 784, 792 (2010) (citations omitted); *City of Coeur D'Alene v. Simpson*, 142 Idaho 839, 844 (2006).

### 2. Idaho's Standard for Determining Judicial Bias Requires Substantial Revision to Confirm Idaho's Law to Constitutional Principles of Due Process.

A more soundly reasoned and holistic view of judicial bias must be adopted in order to conform the standard to the requirements imposed on a constitutional level and reflected in the rulings of the United States Supreme Court. This superior reasoning demands a reassessment of the overly-narrow standard currently governing the issue in Idaho. As practical guidance, this Honorable Court is referred to the exquisite exposition on implicit bias provided by Justice Scalia in the matter *Liteky v. United States*, 510 U.S. 540 (1994). In *Liteky*, the discussion focused on the "extrajudicial source doctrine." The lower court reasoning that a judge is not required to recuse herself simply for forming opinions of the parties during trial or earlier proceedings as it is natural to do so, impossible

not to do so, and central to a judges ability to do her job. *Id.*, at 550-551. Justice Scalia went on to posit that:

> "[i]t is wrong in theory, though it may not be too far off the mark as a practical matter, to suggest, as many opinions have, that 'extrajudicial source' is the only basis for establishing disqualifying bias or prejudice. It is the only common basis, but not the exclusive one, since it is not the exclusive reason a predisposition can be wrongful or inappropriate. A favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment."

*Id.*, at 551. Consequently, for judicial bias to be found, a judge need not form any biased opinion of a party outside of the courtroom and even if such an opinion had been formed.

### 3.    A Legitimate Due Process Issue Will Exist Until an Objective Standard is Adopted in Lieu of the Subjective Approach Currently in Effect.

Julene and Bill do not allege any personal subjective animus of the lower court toward them. Neither do they believe that such a standard would be consistent with sound judicial policy, otherwise any litigant who loses a case or thinks their judge dislikes them would sound the proverbial alarm. However, the magnitude of the lower court's unjustified sidestepping of established law and clear facts demands assessment of this issue. The wholesale adoption of the legally invalid and highly questionable positions advocated by Defendants suggests prejudice by the lower court in favor of forces outside the proper scope of jurisdiction. Regardless of what those forces are, the nature of the ruling is so outlandish as to defy the boundaries of sound judicial discretion.  As one of the many examples deconstructed in this Opening Brief, the issue of judicial estoppel begs the question: how could such an argument be made in light of the clear law on the issue and then accepted without any reason or logic to support that decision by the lower court? With all due respect, Julene and Bill submit to this Court that these issues, which are only raised because of the sheer incredulity of the lower courts 14 April Rulings, should be treated with the

49

deference and reason that is worthy of the American judiciary, for the issue will not be resolved otherwise.

### IV.    CONCLUSION

This case is important from both a legal perspective, a human perspective, and has (quite to the surprise of Julene and Bill) also resulted in a need to examine the entire basis of judicial reasoning in Idaho courts. The first step in correcting the problems raised by reversing the Court's 14 April 2023 Rulings and examining the circumstances giving rise to those rulings and how they must be avoided for the sake of all those subject to the jurisdiction of the Idaho District Courts, including those who are the victims of legal malpractice or (in Julene and Bill's case) far worse besides.

DATED:        10 October 2023              Respectfully Submitted,

For ROSA PLLC:


*/s/Angelo L. Rosa*

_____

Angelo L. Rosa
Attorneys for Plaintiffs-Appellants
JULENE DODD and WILLIAM DODD

50