

**EXHIBIT 3**
**TO**
**DECLARATION OF ANGELO L. ROSA IN SUPPORT OF**
**MOTION FOR A PRELIMINARY INJUNCTION**

Electronically Filed
12/14/2023 9:38 PM
Idaho Supreme Court
Melanie Gagnepain, Clerk of the Court
By: Melanie Gagnepain, Clerk

# IN THE SUPREME COURT OF THE STATE OF IDAHO

| | |
|---|---|
| JULENE DODD and WILLIAM DODD, | Docket No. 50748-2023 |
| Plaintiffs-Appellants, | |
| v. | |
| RORY JONES, ESQ. and JONES WILLIAMS FURHMAN GOURLEY, P.A. | |
| Defendants-Respondents. | |

## APPELLANTS' REPLY BRIEF

Appeal from the District Court of the Fourth Judicial District in and for Ada County
The Honorable Cynthia Yee-Wallace, presiding.

Angelo L. Rosa (Idaho State Bar No. 7546)
ROSA PLLC
950 West Bannock Street, Suite 1100
Boise, Idaho 83702
Telephone:    +1 (208) 900-6525
Fax:          +1 (208) 515-2203
e-Mail:       arosa@rosacommerce.com

Gary L. Cooper
COOPER & LARSEN, CHTD.
151 North Third Avenue, Second Floor
Pocatello, Idaho 83205-4229
Telephone:    +1 (208) 235-1145
Facsimile:    +1 (208) 235 1182
e-Mail:       gary@cooper-larsen.com

*Attorneys for Plaintiffs-Appellants*

*Attorneys for Defendants-Respondents*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................................i

TABLE OF CASES AND AUTHORITIES.....................................................................ii

I.    INTRODUCTION .................................................................................................1

II.   STATEMENT OF LEGAL STANDARD ...........................................................5

III.  ARGUMENT.........................................................................................................6

    A.    Respondents Were, and Remain, Judicially Estopped From Defending This
        Action By Denying the Existence of Medical Malpractice .....................................6

    B.    The Lower Court Erred in Granting Respondents' Motion To Strike the Expert
        Testimony of Dr. Fred Simon, M.D. and Then Respondents' Motion for Summary
        Judgment......................................................................................................................10

    C.    The Lower Court Erred In Granting Respondents' Motion *in Limine* to Exclude
        the Supplemental Disclosures of Nurse Czarnik for Violating the Scheduling
        Order ...........................................................................................................................18

    D.    The Lower Court Erred in Granting Respondents' Motion for Summary Judgment
        on the Breach of Contract Claim Against Respondents .......................................19

    E.    Respondents' Alleged Entitlement to Attorney Fees Defies All Legal Standards
        Applicable to Such Awards ......................................................................................20

    F.    The Volume and Magnitude of the Errors in the Lower Court's Ruling Demands
        Consideration of Judicial Bias and, By Necessity, Whether the Idaho's Standard
        on Bias is Sound as a Matter of Due Process ........................................................21

IV.   CONCLUSION ...................................................................................................31

## TABLE OF CASES AND AUTHORITIES

### Federal Statutes

U.S.C.S. Const. Amend. 14, § 1 ...............................................................................22

### Federal Cases

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) ...............................................23

*Edged In Stone, Inc. v. Northwest Power Sys., LLC*, 321 P.3d 726 (2014)....................17

*In re Murchison*, 349 U.S. 133 (1955).............................................................................23

*Liteky v. United States*, 510 U.S. 540 (1994)..................................................................24

*Lujan v. G & G Fire Sprinklers*, 532 U.S. 189 (2001).....................................................24

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980) ..............................................................22

*United States v. Bosch*, 951 F.2d 1546 (9th Cir. 1991) ...................................................26

*Williams v. Pennsylvania*, 579 U.S. 1 (2016) .................................................................23

*Yuhua Zhu v. United States Dep't of State*, 2022 U.S. App. LEXIS 32215 (9th Cir. 2022)...........27

### State Statutes

Idaho Code § 12-121 ........................................................................................................20

### State Cases

*Bach v. Bagley*, 148 Idaho 784, 792 (2010)...............................................................23, 26

*Bishop v. Owens*, 152 Idaho 617 (2012)..........................................................................19

*Black v. DJO Glob., Inc.*, 168 Idaho 849 (2021) .............................................................25

*Bremer, LLC v. East Greenacres Irrigation Dist.*, 155 Idaho 736 (2013) .....................20

*Edmunds v. Kraner*, 142 Idaho 867 (2006) ...............................................................17, 27

*Erickson v. Erickson*, 521 P.3d 1089 (Idaho 2022)..........................................................................20

*Heinze v. Bauer*, 145 Idaho 232 (2008) ................................................................. 2, 7-8

*In re Revocable Family Tr. of Cornell v. Johnson*, 159 Idaho 778 (2016)............................. 19-20

*Just's Inc. v. Arrington Constr. Co.*, 99 Idaho 462 (1978) ...............................................................20

*Kelley v. Yadon*, 150 Idaho 334 (2011) .......................................................................................20

*Rae v. Bunce*, 145 Idaho 798 (2008)..........................................................................................20

*Rich v. Hepworth Holzer LLP*, 2023 Ida. LEXIS 107 (2023) ...............................................2, 9, 16

*Roe v. Doe*, 129 Idaho 663 (Ct. App. 1996).................................................................................28

*Sanchez v. Arave*, 120 Idaho 321 (1991) .......................................................................................25

*Southern Idaho Production Credit Association v. Astorquia*, 113 Idaho 526 (1996) ....................29

## State Court Rules

I.A.R. 35(b)(6).......................................................................................................................................5

I.R.C.P. 26(b)(4) ....................................................................................................................................

I.R.C.P. 26(e)(2)...........................................................................................................................2, 4, 13

I.R.C.P. 33............................................................................................................................................17

I.R.C.P. 37............................................................................................................................................13

## I.    INTRODUCTION

This reply addresses Respondents' continued insistence upon ignoring the laws governing the issues in this dispute and relying instead upon authority that does not govern, ignoring the undisputed facts supported in the record, and (most fundamentally) ignoring the profoundly substantive issues that necessitate this appeal. Resp. Br. ("Resp. Br.") at 26–48. In their brief, Respondents repeatedly make statements of law (applied out of context and/or wholly inapposite to the issues) and then conclude that Julene and Bill's conduct was improper, all without providing any analysis or reasoning to make the necessary application of law to fact required to make a logically defensible argument. *Id.* The absence of this critical step in reasoning is, as the lower court record and Julene and Bill's opening brief demonstrate, indicia of Respondents' indefensible positions. Curiously—by misapplying the law beyond the limits of acceptable advocacy, ignoring the record, and then repeating their presentation of the resulting (and mind-boggling) conclusions as *faits accomplis*—Respondents continue to display the defective reasoning that the lower court adopted wholesale, thereby necessitating this appeal and raising the unexpected but critical due process issues that come from a series of decisions so poorly made.

With so many improperly decided issues plaguing this matter, Julene and Bill have prioritized those that are most critical, as their resolution in turn impacts the remainder of the lower court's rulings on appeal. The following topics represent those essential threads that, when pulled, will unravel the lower court's decision through stark comparison to the proper application of relevant authority to an accurate body of substantiated facts in the record. As a novel dividend, this will also produce something resembling a just result for Julene and Bill.

First, the bar of judicial estoppel—a threshold consideration whose proper resolution forecloses the defense that Respondents (unwisely) chose to pursue in defense of the lower court

1

action—endures with one of the few new thoughts raised on appeal: Respondents' reliance upon a recent case, *Rich v. Hepworth Holzer, LLP*, 2023 Ida. LEXIS 107 (Idaho 2023)[1] and *Heinze v. Bauer*, 145 Idaho 232, 235 (2008) neither of which have any precedential value in this action. Presumably, Respondents anticipate this Honorable Court will believe that *Rich* is directly on point with the instant case, when the opposite is, in fact, true. Resp. Brief, *supra*, at 28–29, *Rich,* 2023 Ida. LEXIS 107 *1 (Idaho 2023). Respondents' attempt to draw the Court in by asserting that *Rich* "deals with facts nearly identical to those in this case" Resp. Br. at 28. The procedural sequence of lawsuits (a negligently handled medical malpractice case followed by a legal malpractice case) is the only similarity. A plain reading of *Rich* reveals that the case has nothing to do with judicial estoppel and bears no similarity to the issues in this matter.[2] Consequently, *Rich* is nothing other than the proverbial "shiny object" held up in the hopes of distracting this Honorable Court by superficial factual similarities despite having absolutely no relevance to judicial estoppel. Thus, as explained in greater detail below, both *Rich* and *Heinze* are valueless to Respondents' position.

Second, Respondents' incorrect and persistent assertions—that Julene and Bill's expert disclosures were untimely—are predicated on an improper transposition of the legal mandate that a party must promptly supplement their expert disclosures under Idaho Rule of Civil Procedure ("I.R.C.P.") 26(e)(2) with the lower court's Scheduling Order, which carries minimal weight in comparison to the former. This misguided reasoning represents one of a multitude of flawed

---

[1] *Rich* was not cited in the lower court proceedings. Further, Respondents' citations to the *Rich* opinion in their responsive briefing refer to pagination not reflected in any properly formatted decision.

[2] In *Rich*, a lawyer and nurse attempting to expertly testify as doctors and a doctor who attempted to change the foundation of his expert testimony from a local expert to an out-of-area expert through a supplemental disclosure. *Rich* at *1, *24–25, *40, &*7. Further, the plaintiff in *Rich* obtained some relief after her medical catastrophe through a separate settlement, meaning that excluding her experts' testimony did not completely deprive her of justice. *Rich* at *6.

attempts to justify exclusion of well-founded and timely disclosures of Julene and Bill's causation expert, Fred Simon, M.D. ("Dr. Simon"). This same fallacy drives Respondents' callous disregard for unforeseeable and uncontrollable delays (namely the death of Julene and Bill's damages expert, Rebecca Czarnik's mother), which was promptly disclosed, required supplemental disclosure of her previously disclosed opinions and attested to direct damages in excess of $8MM, all of which was completed six (6) months before trial and with full deference to accommodating Respondents' need for cross-examination. It is understandable that any documented analysis supporting direct damages of this magnitude would be met with enthusiastic scrutiny. What is not understandable, however, is the lower court's disregard for the determination of prejudice that must be conducted when evaluating a motion in limine to summarily exclude testimony on the grounds of alleged untimeliness, particularly when scheduling orders are not intended to prejudice a party when ample time and opportunity for cross-examination exists and the cadence of the disclosure is the product of a death of an expert's parent, not a premediated ambush on the eve of trial. Respondents' briefing, consistent with their briefing before the lower court, does nothing to specify the existence of actual prejudice or its nature. Instead, a robotic repetition of the scheduling order's primacy takes the place of actual analysis, just as the lower court's ruling demonstrates.

Third, Respondents' briefing provides no new or persuasive arguments to substitute the dearth of motions to strike Dr. Simon's expert opinions claiming (against the weight of the record) that no foundation existed for those opinions. This allegation is commingled with the above-referenced arguments concerning supplemental expert witness disclosures, with Respondents attempting to gloss over their failure to obtain necessary discovery and compel any information by seeking such relief (improperly) through a motion to strike. Respondents use this procedurally twisted tactic by arguing that scheduling deadlines must be adhered to or else discovery sanctions

3

may be issued while at the same time only mentioning the law that requires expert testimony to be supplemented in order to argue that the lower court was correct ignore it. *See* Resp. Br., *surpa*, at 44. This dubious approach must be compared to the actual substance of the lower court record, which showcases the expert testimony of a skilled surgeon testifying on the standard of care and (as demonstrated below) consistently and justifiably supplementing his testimony (under the mandate of I.R.C.P. 26(e)(2)) to reinforce (not vary) his original opinions. Rather than recognize the truth, that the foundation of Dr. Simon's opinions only expanded as fact and expert discovery were completed, the lower court simply took the easy path of adopting Respondents' "reasoning" whose merit (as has been, and shall continue to be, demonstrated as) does not withstand the scrutiny applied to such decisions on appeal.

Finally, while these same defects apply to the decision-making applied to Julene and Bill's second motion for summary judgment (as to breach of contract) and the rulings on myriad evidentiary objections that Respondents filed in bulk, it is the foregoing three topics that inform all key rulings in the Order on appeal. The cumulative effect of so many rulings--that defy the law, ignore the record, and blindly adopt the defective arguments proffered by Respondents raises the uncomfortable question: "why?" This is not a case involving nuanced questions of law or fact prone to multiple meritorious yet distinct interpretations. Yet, as a result, the lower court's slavish deference to Respondents' flawed reasoning is so acute and so complete that this appeal is not the product of mere disagreement by Julene and Bill but an elemental and mandatory response to a ruling that is beyond the liberally construed boundaries of judicial discretion. Whether the product of probable or of obscure factors, a ruling such as that at issue demands consideration of judicial bias. Given the underdeveloped definition of judicial bias in this jurisdiction, the lower court has unwittingly created a legitimate basis for considering the standard of bias in the context of due

process. Moreover, the willingness to ignore the law and the facts with the inhumanity shown toward Julene and Bill after they met (if not exceeded) their burden of proof is too unconscionable to go unquestioned. Apart from remedying their being victimized for the third time by institutions charged with duties of the utmost care and competence, the lower court's decision implicates constitutional issues that will survive the resolution of Julene and Bill's situation. This Honorable Court is, again, implored to correct the profound abuses of discretion committed by the lower court and challenged on appeal.

## II.    STATEMENT OF LEGAL STANDARD

Despite the wide latitude that is provided to a responsive brief on appeal, there is a minimal standard to which such a brief must conform and it is succinct and straightforward: Idaho Appellate Rule ("I.A.R.") 35(b)(6) states that Respondents' responsive briefing "should contain the contentions of the respondent with respect to the issues presented on appeal, the reasons therefor, with citations to the authorities, statutes and parts of the transcript and record relied upon." Put another way, Respondents' briefing is intended to demonstrate why the lower court's decisions were the product of property exercised judicial discretion. However, precisely what "point" Respondents intended to make in their brief is, candidly, a mystery considering the minimal additions to their repeated submissions to the lower court.

Julene and Bill have stated repeatedly that this appeal is not the product of mere dissatisfaction with the lower court's rulings, but more critically it is a product of the fact that those rulings constitute a wholesale disregard for the law and a failure (and/or refusal) to properly analyze the facts and to reach conclusions through the exercise of sound reason. These monumental errors are catalogued in the opening brief and below in this reply. In comparison, there is little about Respondent's submission that is "responsive" within the meaning of I.A.R. 35(b)(6).

### III.    ARGUMENT

Respondents do not identify any facts, evidence, portions of the appellate record or other legitimate content to demonstrate that the lower court did not abuse its discretion when making the rulings that are at issue. Resp. Br. at 26–48. Whether the product of apathy, hubris, or the expectation that the judiciary will shield the lower court and therefore the Order on appeal, Respondents have chosen to use their opposition to regurgitate existing position statements peppered with a few additional case citations. *Id.* Julene and Bill purposefully call them "position statements" because they consist of identifying a filing, disclosure, or some other action and then stating it is defective, incorrect, or otherwise illegitimate. Yet, at no point do Respondents provide the sort of deductive reasoning based upon valid premises that are true and required to create a colorable argument. *Id.* Instead, Respondents spin out repetitive statements that Dr. Simon's expert disclosures lack foundation because they say so and they are untimely, that Rebecca's Czarnik's disclosures are inadmissible because Respondents have claimed their disclosure is prejudicial. Resp. Br. at 28–45. Both the lower court's order being appealed and the submissions relating to the key motions ruled upon have left skilled litigators, academics, judges and others perplexed. Julene and Bill have purposefully articulated each position (however elementary) with precision to dispense with Respondents' logically vapid statements and their adoption en masse by the lower court.

### A.    Respondents Were, and Remain, Judicially Estopped From Defending This Action By Denying the Existence of Medical Malpractice.

Respondents solicited and represented Julene and Bill, spent two years as counsel before filing an untimely medical malpractice complaint on their behalf. These facts, and the decisions they evidence, narrow the options for defending any action for legal malpractice. Respondents have failed to provide persuasive legal authority or factual support refuting the essential truth that

they are judicially estopped from defending Julene and Bill's claims by alleging that no medical malpractice occurred. Resp. Br. at 26–28. Further, Respondents' introduction of a case (*Rich*) for the first time on appeal is equally flawed. The prevailing law does not permit an attorney to solicit clients for a medical malpractice action, represent them for over two years, file a medical malpractice complaint on their behalf after the expiration of the statute of limitations, and then (when sued for legal malpractice) turn around and argue that no medical malpractice occurred.

The doctrine of "[j]udicial estoppel is intended to prevent abuse of the judicial process by deliberate shifting of positions to suit the exigencies of a particular situation." *Heinze v. Bauer*, 145 Idaho 232, 235 (2008) (citation omitted). *Heinze* deals with "whether an attorney's statements in the course of representation of a client may be used against the attorney in subsequent legal malpractice litigation." *Id.,* at 237. Although the answer in *Heinze* is 'no,' unlike *Heinze*, ours is not a case of an unfavorable ruling after which the client goes after her attorney for legal malpractice. Further, the ruling in *Heinze* is not absolute. *Id.,* at 238. The court in *Heinze* notes that its "conclusion, that statements made by attorneys in the course of representation of a client may not be used against them in subsequent legal malpractice claims,] does not mean that every statement by a lawyer in the course of earlier litigation may not be used against that lawyer in a subsequent malpractice action. Representations of fact, purporting to be on the basis of the lawyer's personal knowledge, may well be used against that lawyer in subsequent proceedings. Certainly, statements in an affidavit of an attorney purporting to be based upon personal knowledge would not be governed by [this] holding." *Id.* (internal citations omitted).

Additionally, even if *Heinze* bars Julene and Bill from invoking the doctrine of judicial estoppel with regards to statements made by Respondents in the course of their representation of Julene and Bill, the question of whether an attorney's statements in the course of *soliciting*

representation of a client may be used against the attorney in subsequent legal malpractice litigation still remains. Jones solicited Julene and Bill for representation when he went to the hospital in which Julene was admitted and proposed that he represent Julene and Bill in a medical malpractice case and a loss of consortium case. Jones stated that the case was "huge"; that Dr. Fredline and the hospital already knew they would have to settle with Julene and Bill; and that Bill would have a case for loss of consortium. [R. 1132:11-12, 1132:14-15].

*Heinze* states a principle that is directly applicable to the instant case: that judicial estoppel "should only be applied when the party maintaining the inconsistent position either *did have, or was chargeable with, full knowledge of the attendant facts prior to adopting the initial position*." *Id.,* at 235 (emphasis included). One would hope that an attorney would have full knowledge of the attendant facts prior to soliciting someone, who was not seeking legal representation, as a client and leading them to believe that they had a huge case. The principles of this very case, cited by Respondent, would have this Honorable Court legitimate the notion that an attorney can solicit business from persons not actively seeking legal representation without believing a viable case exists just to let the statute of limitations pass, then file the action anyway, tell the client to sue for them legal malpractice, and then defend that action by simply stating that the client did not have a case to start with, engage the doctor named as a defendant in the malpractice action as an expert, and then sue the client for attorney fees when challenging a court's order agreeing with the attorney in denying their claims. This species of insanity is precisely what the doctrine of judicial estoppel exists to guard against: what the court in *Heinze* charitably described as "playing fast and loose with the court." *Id.*, at 236 (internal citations and quotations omitted).

1.    **Respondents' Reliance Upon the *Rich* Case Further Confirms the Absolute Bar Imposed on Respondents by the Judicial Estoppel Doctrine Under the Present Facts.**

8

Despite Respondents' claim, *Rich v. Hepworth Holzer, LLP* has absolutely nothing to do with judicial estoppel. Respondents misrepresent *Rich* to support the argument that "[t]he Idaho Supreme Court has recognized that even testimony under oath from an experienced litigation lawyer in a medical malpractice case is inadmissible to provide medical malpractice because the lawyer is 'not a medical expert' and his comments on 'alleged medical malpractice and subsequent causation are without foundation.'" Resp. Br. at 27–28, *Rich* at *25. The testimony that Respondents are referring to in *Rich* came from an attorney attempting to offer an expert medical opinion on causation and damages for Rich's underlying medical malpractice case, rather than an expert legal opinion. *Rich* at *25. Respondents' efforts to compare the instant case to *Rich* are misplaced because not only does an attorney not need to be able to testify as an expert in an area to represent a client in a case related to that area, the issues in this case do not concern a lawyer attempting to expertly testify as a doctor. The excerpt from *Rich* that Respondents cite to is not about judicial estoppel at all. It is about improper expert testimony. There is no direct or analogous value to this authority. *Rich* does not apply to this issue and its use is unhelpful to this Court's task.

In the instant case, the facts are completely different. We are not dealing with the sworn expert testimony of an attorney. We are dealing with an attorney, Respondents, who solicited Julene and Bill Dodd to be their clients, when Julene and Bill were not even seeking legal representation, in a medical malpractice case that they assured Julene and Bill would be a success. [R. 1132:8-16]. Respondents then waited until *after* the statute of limitations had expired to file Julene and Bill's action. [R. 37:21–23]. Had they not filed the Complaint, it is conceiveable that Respondents could have had a broader choice of defenses to any subsequent legal malpractice action. However, the Complaint was filed and submitted and thus subject to the representations of I.R.C.P. 11. After filing the complaint late, Respondents told Julene and Bill to sue them for legal malpractice to get

9

their money back. R. 38:22–25. In defense of the claim that Respondents told Julene and Bill to make against them, Respondents now argue that there was no medical malpractice in the first place, which begs the question, why late file the claim if there was no case to begin with. Clearly, this is a totally different issue from that in *Rich* and, again, *Rich* does not apply.

*Rich* is not valid authority here because its reasoning is irrelevant to the facts of the instant case. The relevant facts and issues from *Rich* are neither analogous nor comparable to those of the instant case. Yet again, Respondents' reliance on *Rich* is misplaced and shallowly researched.

**B.    The Lower Court Erred in Granting Respondents' Motion To Strike the Expert Testimony of Dr. Fred Simon, M.D. and Then Respondents' Motion for Summary Judgment.**

Respondents have failed to show that Julene and Bill have not proved their "case within a case" and instead have only repeatedly stated that if Julene and Bill's medical expert's testimony is excluded, then Julene and Bill *cannot* prove their "case within a case." Resp. Br. at 29. In their brief, Respondents quote "'[t]he Court agrees that in striking Dr. Simon's declarations, Dodds cannot show that they have 'some chance of success' in the underlying medical malpractice action.'" Resp. Br. at 29. In this, Respondents do not show that the "Dodds failed to establish an essential element of their legal malpractice case by failing to prove an essential element of the 'case within the case,'" rather, they merely state the obvious, that without their expert on standard of care, Julene and Bill cannot bring a case at all. As stated above, this is the same sort of premise/conclusion couplet that leaves out the essential elements of reasoning and analysis. If Julene and Bill are wrong about this, then all that really needs to be said to prevail in this appeal are the statements: "Respondents and the lower court claim Dr. Simon's testimony lacks foundation. All of them are wrong because Dr. Simon's testimony has extensive foundation. The lower court should be reversed." Alas, while this is the disturbing approach that the lower court

10

used to gut the well-established claims made against Respondents, Julene and Bill intend to connect the dots in the manner that elementary principles of jurisprudence require.

**1.      Dr. Simon's Disclosures Are, By Their Detail and Timing, Both Well-Founded and Timely.**

Any of Respondents' motions to strike Dr. Simon's disclosures are grounded in the following thinking:

> *If Dr. Simon's testimony is conclusory and lacks foundation, then it is inadmissible.*
> *Dr. Simon's testimony is not admissible.*
> *Therefore Dr. Simon's testimony is conclusory and does not have a foundation.*

This is the same 'reasoning' known in the world of propositional logic as a 'fallacy of the converse,' leading to outcomes as disturbing as the lower court's and possessing as much legitimacy as a commonly used example of the fallacy:

> *If an animal is a dog, then it has four legs.*
> *My cat has four legs.*
> *Therefore, my cat is a dog.*

In reality, Dr. Simon's expert disclosures were made with meticulous detail, specifying the scope of his expert opinions, the information considered in forming the expert opinions, his basis of his familiarity with the local standard of care applicable to medical malpractice, the opinions themselves, and the relevance of opinions to Julene and Bill's claims along with a reservation of the right to amend the opinions. The following chart clarifies where this critical data is found in the lower court record identify where the foundation of Dr. Simon's opinions are found and the reasons for the ongoing supplementation.

| Date | Format | Foundation | Reasons for Amendment |
|---|---|---|---|
| 09-09-2022 | Opinion report in declaration format, I.R.C.P. 26(b)(4) disclosures, and standalone opinion report. R. 482-514. | R. 485-486, 511-513. | N/A (Original Disclosure) |

| Date | Format | Foundation | Reasons for Amendment |
|---|---|---|---|
| 11-03-2022 | Supplemental Expert Witness Disclosure. R.3563-3604. | R. 3573-3575 | N/A (Original Disclosure) |
| 11-16-2022 | Amended Declaration and opinion. R. 1612-1648. | Amended Decl. at ¶¶ 16-18. R. 1615-1619.<br><br>Report. R. 1642-1648 | Respondents' production around 10 November 2022 of 733 pages of documents; submission of Declaration by Forrest Fredline. R. 1615-1619. |
| 12-29-2022 | Second Supplemental Declaration and standalone opinion report. R. 2571-2575. | Second Supplemental Declaration at ¶¶ 3-7, R. 2572-2574. | First deposition session of Fredline; receipt from St. Alphonsus' of complete records for Julene from 2017; Declaration of Justin Barton. |
| 01-30-2023 | Second Supplemental Report/Declaration R. 3325-3339. | Second Supplemental Expert Report at ¶¶ 5-6, R. 3327-3330. | Cross examination of Forrest Fredline; submission of Respondents' expert witness disclosures. |
| 03-03-2023 | Plaintiffs' Rebuttal Expert Witness Disclosures. R. 3697-3819 | Third Supplemental Expert Opinion Report at ¶¶5-6, R. 3719-3722. | Respondent's submission of opinions by Drs. Joshua Barton and Darren Wong. R. 3722-3733. |

All of Dr. Simon's above-referenced submissions are defined by three fundamental qualities:

First, each specifically identifies in detail the basis and foundation of Dr. Simon's opinions: his active practice in and outside of Idaho, his extensive review of Julene's entire medical file and other materials, the submissions made in the case, and his re-confirmation of the standard of care applicable to gastrointestinal and endoscopic surgery in Ada County. *See, e.g.,* R. 1647-1648. Every category of Dr. Simon's submissions is explored great detail, identifying the healthcare chronology and explaining why the care provided fell below the standard of care. Ironically, the central argument that Respondents mustered repeatedly in motions to strike and opposition to Julene and Bill's Motion for Partial Summary Judgment. In response, Julene and Bill were forced to "go back to basics" and explicitly walk through each step of determining the validity of an

12

expert opinion, demonstrating at each step how Dr. Simon's disclosures met those standards. *See, e.g.,* R. 2560-2569, 3208-3212, 3215-3220

Second, each successive supplemental submission was not the product of Respondents' repeated and tiresome motions to strike, but rather the fulfillment of Julene and Bill's duties of supplemental disclosure specified by I.R.C.P. 26(e)(2). Discovery in this case dragged on and accumulated to the point where in late 2022 new evidence and testimony was obtained that mandated supplementation of the kind contemplated by Rule 26(e)(2). As detailed in the record and cited in the chart above (*see supra*), Dr. Simon's reports itemized each successive body of data considered and performed the analysis relative to the question of whether the relevant standard of care was violated. Every supplementation, and the newly acquired information prompting that supplementation, reinforced Dr. Simon's opinions and provided further empirical bases for the conclusion that Fredline and St. Alphonsus indeed violated the standard of care. Respondents' attacks on these supplementations grew ever more shocking, reaching the point where they contended the supplementations violated the lower court's scheduling order. *See, e.g.,* R. 2364-2365. This extreme and wholly meritless submission illustrates Respondents' total disconnection from (or willful refusal to acknowledge) the disclosure requirements of I.R.C.P. 26, the ongoing supplementation of Dr. Simon's disclosures and the propriety of that supplementation in the proper functioning of the expert discovery process. Respondents then try to argue that a failure to respond to a discovery question provides a basis for excluding testimony when no discovery motion under Rule 37 is brought and a request to strike is made in lieu of the requirements mandating Respondents' meet and confer with Julene and Bill, followed by a motion to compel. Instead, Respondents have the lower court (improperly) make up for their own procedural failures. R. 2365-2367. A request that the lower court (improperly) indulged! As Julene and Bill have argued to the

13

lower court, there is no disclosure that would not trigger the tiresome stream of objections from Defendants that litter the record in this appeal. This does not change the irrefutable substance of Dr. Simon's disclosures. It is now for this Honorable Court to make that determination.

Third, and critically, each supplementation is explicitly clear that none of the reasons for supplementation changed his original and central opinion: that Fredline and St. Alphonsus' healthcare provided to Julene fell below the applicable standard of care in the community where they were provided. By the time fact discovery was completed, it became necessary for Dr. Simon to address Respondents' meritless attacks rife with charts containing meritless comparisons (*see, e.g.,* R. 2368-236) and continued characterizations of Dr. Simon's submissions as "untimely." Rather than go down this rabbit hole of twisted logic and false facts, Dr. Simon's clear and repeated statements as to the consistency and scope of his opinions along with detailed analyses, was submitted in response. *See* R. 3326-3327. Indeed, whereas the underlying opinions were only supplemented with more and more discovery as it became available and additional academic citations as ornamental validation of his opinions, the only "change" to Dr. Simon's opinions were the inclusion of rebuttals to Respondents' expert disclosures, which Julene and Bill were entitled to rebut, and which were timely submitted. Even those rebuttals harmonized with the underlying opinion as to the standard of care, which remained constant throughout the lower court proceedings.

The grotesque waste of time and energy that Respondents' Motions to Strike evidence is an attempt to distract the lower court from the fact that Respondents had the opportunity to depose Dr. Simon, noticed the deposition and paid his witness fees. They obtained a continuance of summary judgment hearings to accommodate his deposition [R. at 1174-1179] on the basis that, inter alia, "(1) the deposition is necessary to determine if there is a basis for a Motion to Strike

some or all of Dr. Simon's opinions; and (2) the deposition is necessary to defense experts to determine if there are disputes of fact and opinion about the contents of Dr. Simon's Declaration." *Id.* at 1175. Respondents then noticed the deposition and paid the requisite witness fees [*Id.* at 1219-1221] then moved to strike Dr. Simon's declaration. *Id.* at 1321-1335 and, bizarrely, cancelled the deposition. *Id.*, at 1649-1651. It can only be inferred that Dr. Simon would have eviscerated any nonsensical attempts at cross-examination Respondents might try if they were to depose Dr. Simon. Certainly, the quality of Respondents' later examination of Dr. Fredline indicates this is likely the case. Nonetheless, it seems Respondents were counting on the lower court to be taken in by the sheer volume of meritless objections in favor of paying closer attention to the substance and cadence of Dr. Simon's own submissions, which (in a court of law) is considered standard practice in relation to the ongoing nature of fact and expert discovery and need for supplementation to reflect the fullness of the record once the relevant discovery cut-offs have been reached!

The fact that the hearings (which yielded the order from which this appeal is taken) were continued multiple times to 14 February 2023 and March 2023 allowed the benefit of all Dr. Simon's supplemental disclosures, the full panoply of which rendered all of Respondents' duplicative motions to strike moot. The final disclosures of Dr. Simon circumscribed the entire volume of discovery, both fact- and expert-oriented. Rather than abiding by the principles set forth repeatedly in the body of precedent governing such discovery, the lower court adopted the Respondents' reasoning, reasonably paraphrased as: "Dr. Simon's opinion lacks foundation because I have said the opposite of what Dr. Simon said." As Respondents and the lower court have wielded such defective logic, the duty of this Honorable Court to discard this flotsam becomes all the more necessary.

Again, *Rich* does not apply. The similarities between *Rich* and the instant case are that *Rich* deals with a legal malpractice case stemming from an underlying medical malpractice case and excluded supplemental expert testimony from a doctor and a nurse. *Rich* at *1, *7, and *40. But, at variance with the instant case, in *Rich*, the doctor's supplemental expert testimony was excluded because the doctor used a supplemental disclosure to change the foundation of his testimony from local expert to out-of-area expert; and the nurse's expert testimony was excluded because she attempted to testify as to the standard of care for an M.D. *Id.* at *7 and *40. Further, *Rich* also deals with excluded expert testimony from a lawyer attempting to testify as to medical duty and causation. *Rich* at *25. These issues are all plainly distinguishable from those of our case.

In the instant case, Dr. Simon, expertly testified as a doctor. Dr. Simon never changed his expert opinions nor the foundation of his testimony. He reasonably supplemented his expert testimony as needed and as required by the law. Further, Nurse Czarnik expertly testified as a nurse. She filed a supplemental report because she was delayed by her mother's death. R. 2578:7–8. No expert attempted to testify about a specialty they were not qualified to testify about and no expert changed the foundation of their testimony through a supplemental disclosure or otherwise.

### 2. As the Record Pinpointed Above Demonstrates, Dr. Simon's Testimony Has Been Based Upon Correct Foundation

Again, the facts of *Rich* are distinguishable from those of the instant case. In *Rich*, the Idaho Supreme Court excluded a supplemental disclosure from a doctor expert witness because it said that the supplement changed the foundation of the expert testimony from that of a local expert to that of an out-of-area expert. *Rich* at *43–*44. Thus, the court said the disclosure violated the scheduling order because it presented a new opinion by changing the foundation of the expert testimony. *Rich* at *44–*45. The court did not say that the supplement would have been untimely had the expert witness in question merely added additional foundation to his opinion rather than

16

changing the foundation all together. Conversely, Dr. Simon added foundation for his opinions, he did not change the foundation and he did not change his opinions. The issue for the court in *Rich* was not so much the timing of the supplement as it was the change in the foundation of the testimony.

Further, as evidence of how absurd the lower court's treatment of Dr. Simon's testimony is, Respondents argued that they requested the name of the local physician with whom Dr. Simon conferred but were never provided that information. This alleged failure to disclose the physician was never the subject of a meet and confer letter to Julene and Bill, was never the subject of a motion to compel further responses. Yet, the lower court bypassed the requirements of Idaho Rules of Civil Procedure 26, 33 and 37. In comparison, when Julene and Bill attempted to take the deposition of one of Respondents' experts on the only day that the Rules of Civil Procedure and Scheduling Order provided, the Court issued a Protective Order without hearing, without briefing. Even after the parties had agreed on an alternative date, the Court would not reverse its ruling. This pair of vignettes from the lower court proceedings speaks to the broader defects that mandate the present appeal: the Rules of Civil Procedure have been applied selectively, Respondents have been held to less stringent standards of compliance than Julene and Bill, and the results are seen throughout the lower court's ability to misuse judicial discretion to justify an outcome that is patently defective.

> **3.    The Record Plainly Demonstrates That Dr. Simon's Testimony Was Timely**

Dr. Simon's supplements to his expert testimony were not a violation of the scheduling order. Further, Dr. Simon never changed any of his opinions nor did he add new opinions after the deadline. In Julene and Bill's case, by emphasizing that "Plaintiffs were required to disclose a complete statement of *all opinions* to be expressed by their retained experts on or before" the

17

deadline, the district court precluded Julene and Bill from lawfully supplementing their experts' testimony. R. 4941:12–13. Because if in fact, *all* opinions must be given by the discovery deadline, then it is impossible for the "substance [or] subject matter of an expert's testimony" to be "modified, expanded upon, or otherwise altered in some manner." *Edmunds v. Kraner*, 142 Idaho 867, 874 (2006).

C. **The Lower Court Erred In Granting Respondents' Motion *in Limine* to Exclude the Supplemental Disclosures of Nurse Czarnik for Violating the Scheduling Order.**

It appears that Respondents are arguing that more planning should have preceded the disclosure of Nurse Czarnik's expert opinion. Respondents, in their brief, (as well as the lower court in its ruling) all but suggest that Julene and Bill Dodd should have known that Nurse Czarnik's mother would die while Nurse Czarnik was preparing her report so Julene and Bill should have sought leave of the court to file late disclosures. Resp. Br. at 22–23. To argue that the lower court's ruling was proper here, Respondents cite pages 4929–36 of the Clerk's Transcript. Page 4929–30 of the Clerk's Transcript recites the history of the issue of Nurse Czarnik's supplemental disclosure. And after restating each side's argument, the lower court states simply that it agrees with Defendants and uses most of the following three pages (4931–33) to restate the rules concerning discovery sanctions, supplemental responses, and trial preparation of expert witnesses. Then the court discusses abuse of discretion and whether a discovery violation has occurred and goes on to say that a death in Nurse Czarnik's immediate family is not good enough cause for the delay in her report. There is very little if any analysis and the court certainly did not spend "ample time analyzing each issue under governing law" as Respondents suggest on Page 44 of their brief. If anything, the court stated the law and then stated that Julene and Bill violated it.

18

Nurse Czarnik gave a reasonable excuse for why her supplemental report was necessary, the death of her mother, and Respondents did not allege that the supplemental filing caused them any harm, only that it had the potential to. The court abused its discretion by pushing beyond why the supplement was not filed before the scheduling order's deadline and asking why the death of Ms. Czarnik's mother had the effect of delaying her report. Further, if Nurse Czarnik's supplemental filings were detrimental to Respondents, they would have accepted Julene and Bill's attempt to extend Respondents' discovery deadline.

**D.     The Lower Court Erred in Granting Respondents' Motion for Summary Judgment on the Breach of Contract Claim Against Respondents.**

To state a claim for breach of contract under Idaho law, a plaintiff must plead the following elements: (1) the existence of a contract; (2) breach by the defendant; (3) the breach caused damages; and (4) the amount of damages. *Edged In Stone, Inc. v. Northwest Power Sys., LLC*, 321 P.3d 726, 731 (2014) (quoting *Mosell Equities, LLC v. Berryhill & Co., Inc.*, 297 P.3d 232, 241 (2013)). The Contingent Fee Agreement between Julene and Bill and Respondents was a valid and enforceable contract between the parties. The Contingent Fee Agreement called for Respondents' representation of Julene and Bill in pursuing the Medical Malpractice Action. Finally, Respondents failed to timely file the Medical Malpractice Action. Julene and Bill have properly pled breach of the Contingent Fee Agreement against Defendants.

The Idaho Supreme Court clearly recognizes theories of recovery for legal malpractice sounding both in tort and in contract: "[l]egal malpractice actions are an amalgam of tort and contract theories." *Bishop v. Owens*, 152 Idaho 617, 620, 272 P.3d 1247, 1251 (2012), and *In re Revocable Family Tr. of Cornell v. Johnson*, 159 Idaho 778, 781, 367 P.3d 173, 176 (2016) (quoting *Johnson v. Jones*, 103 Idaho 702, 706, 652 P.2d 650, 654 (1982)). "While a breach of contract is not a tort, a contract may create the circumstances for the commission of a tort" [*Just's*

19

*Inc. v. Arrington Constr. Co.*, 99 Idaho 462, 468, 583 P.2d 997, 1003 (1978)], hence Julene and Bill's claim for professional negligence which was the subject of their Motion for Partial Summary Judgment as to Liability. However, a contract claim for legal malpractice exists in the shape of an attorney's failure to perform obligations directly specified in the written contract. *Johnson*, 103 Idaho at 704, 706-07, 652P.2d at 652, 654-55. Moreover, it is well established that the tort of legal malpractice is also a breach of the attorney-client relationship. *Id.*; see also *Fuller v. Wollters*, 119 Idaho 415, 425, 807 P.2d 633, 643 (1991). As the lower court did everywhere else in the former proceedings, here too it set aside Julene and Bill's argument without analysis or reasoning, in favor of Respondents.

E.    **Respondents' Alleged Entitlement to Attorney Fees Defies All Legal Standards Applicable to Such Awards.**

Under Idaho Code §12-121, "the judge may award reasonable attorney fees to the prevailing party or parties when the judge finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation." Additionally, "[u]nder I.C. § 12–121, a party is entitled to attorney's fees if the appeal merely invites the appellate court to second guess the trial court on the weight of evidence." *Kelley v. Yadon*, 150 Idaho 334, 338 (2011). An appeal could be considered frivolous, unreasonable, or without foundation if it presents arguments that were not properly raised to the lower courts. *Erickson v. Erickson*, 521 P.3d 1089, 1108 (Idaho 2022). Additionally, if an appeal is "devoid of any legal or factual basis" it may be found to be frivolous, unreasonable, or without foundation. *Rae v. Bunce*, 145 Idaho 798, 806 (2008). But, it is important to note that under Idaho Code §12-121, attorney fees are only available when there is not *any* "legitimate, triable issue of fact or a legitimate issue of law." *Bremer, LLC v. East Greenacres Irrigation Dist.*, 155 Idaho 736, 745 (2013).

20

Respondents argue that Julene and Bill brought this appeal frivolously, unreasonably, and without foundation, but as we have seen throughout this process, do not give any analysis nor reasons why. Resp. Br. at 48. This Court has been provided with an opening brief that illustrates in nauseating detail the history of this case, the underlying facts and its culmination in a single omnibus ruling that ignores the law, the facts, and omits reason. For the Respondents to even intimate this appeal is frivolous or meritless demonstrates just how much Respondents will disgrace this profession and the service it exists to give by defending the indefensible.

This appeal exists not simply because Julene and Bill disagree with the lower court's ruling. It exists because the nature of that ruling departs from all established principles of sound reason, proper application of the law, and the fundamentals of how judicial discretion is properly exercised. Julene and Bill did not bring this appeal unreasonably, frivolously, or without adequate foundation. In fact, the only reason this appeal is necessary is because Respondents solicited Julene and Bill as clients and then encouraged Julene and Bill to sue them after allowing the statute of limitations to pass before late filing a claim for Julene and Bill. R 1132:3-15; 37:21–23. Julene and Bill's appeal is not brought for improper purpose nor without legal support. The purpose of Julene and Bill's appeal is to seek justice for Julene and Bill Dodd, justice they would have received had Respondents filed Julene and Bill's case before the expiration of the statute of limitations. The legal support has been succinctly laid out above.

Furthermore, the lower court never looked at the evidence, it just excluded it. We do not want this court to re-weigh the evidence, rather, we ask this court to consider and balance the evidence for the first time.

F.      **The Volume and Magnitude of the Errors in the Lower Court's Ruling Demands Consideration of Judicial Bias and, By Necessity, Whether Idaho's Standard on Bias is Sound as a Matter of Due Process.**

21

*Why defend a claim by denying the existence of medical malpractice against the weight of judicial estoppel after soliciting clients for representation, claiming the case was "huge", spending two years on a case, and filing a complaint for medical malpractice under penalty of I.R.C.P. 11?*

*Why forego the deposition of an expert witness on causation in favor of filing motions to strike, mistake the law, and misrepresent the record?*

*Why forego the deposition of an expert establishing $8MM in direct damages in favor of filing a motion in limine six months before trial because the death of the expert's mother created a need for supplementation?*

*Why not follow the requirements of I.R.C.P. 37 to obtain information believed to have not been provided?*

*Why seek the testimony of the very doctor who committed malpractice and designate him as an expert only to have that testimony eviscerated by an opposing expert?*

These questions, among others, become even more pressing when the lower court issues an order that endorses every one of the decisions with no reason or logic and effectively guts this case, necessitating the immediate appeal that was taken and including among the list of issues posed by the recent decision of the lower court that of due process.

Starting with the basics, under the United States Constitution, no State shall "deprive any person of life, liberty, or property." U.S.C.S Const. Amend. 14, § 1. An impartial justice system is imperative to the constitutional guarantee that all persons are entitled to "due process of law." "The 'Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases.' *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980); accord *In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."). The

United States Supreme Court has explained that '[t]his requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process. The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law.' *Marshall*, 446 U.S. at 242 (internal citations omitted). An individual, the Court wrote, must be assured 'that the arbiter is not predisposed to find against him.'" *Id.* "This due process right 'has been jealously guarded by this Court' because it 'preserves both the appearance and reality of fairness, generating the feeling, so important to a popular government, that justice has been done.'" *Id.*

The Supreme Court has held that due process requires an "objective" inquiry into judicial bias and that "[a] fair trial in a fair tribunal is a basic requirement of due process." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881, 876 (2009) (internal quotations omitted). Further, "[a] fair trial in a fair tribunal is a basic requirement of due process" and "our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison*, 349 U.S. 133, 136 (1955). Under *Williams v. Pennsylvania*, the United States Supreme Court framed the standard for determining judicial bias by asking "not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias. *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016).

In contrast, the standard for determining judicial bias in Idaho, that "unless there is a demonstration of pervasive bias derived either from an extrajudicial source or facts and events occurring at trial, there is no basis for judicial recusal," is unconstitutionally narrow as it excludes

23

many potential ways that judicial bias may occur and conflicts with multiple SCOTUS rulings. *Bach v. Bagley*, 148 Idaho 784, 792 (2010) (internal citations omitted).

Idaho's standard also directly conflicts with the United States Supreme Court's ruling in *Liteky v. United States* in which Justice Scalia stated that "[i]t is wrong in theory, though it may not be too far off the mark as a practical matter, to suggest, as many opinions have, that 'extrajudicial source' is the only basis for establishing disqualifying bias or prejudice. It is the only common basis, but not the exclusive one, since it is not the exclusive reason a predisposition can be wrongful or inappropriate. A favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment." *Liteky v. United States*, 510 U.S. 540, 551 (1994).

"When a state law…is challenged on due process grounds, [the court inquires] whether the State has deprived the claimant of a protected property interest, and whether the State's procedures comport with due process." *Lujan v. G & G Fire Sprinklers*, 532 U.S. 189, 195 (2001) (citation omitted). The following considerations demonstrate how Respondents' arguments on this topic in their brief are irrelevant and more critically, where the issue of bias arises when the granular substance of the lower court's ruling is examined through the lens of due process:

   **1.**   **Respondents' Arguments Regarding Timing of the Issue on Appeal are Incorrect and Should be Summarily Disregarded.**

Although Respondents stress that it "is fundamental that a party must raise an issue on appeal first before the trial court," not raising the issue of judicial bias with the trial court does not preclude Julene and Bill from raising it now. Resp. Br. at 45. Respondents cite to *Sanchez v. Arave* to make this argument. Resp. Br. at 45. *Sanchez v. Arave* is about a plaintiff who did not challenge the constitutionality of a statute until his appeal to the Idaho Supreme Court. Respondents recite

24

the rule that the court gives in *Sanchez*, that the court "will not consider issues that are presented for the first time on appeal," but stop before mentioning the court's stated, over 150-year-old, rationale for the rule: "It is for the protection of inferior courts. It is manifestly unfair for a party to go into court and slumber, as it were, on [a] defense, take no exception to the ruling, present no point for the attention of the court, and seek to present [the] defense, that was never mooted before, to the judgment of the appellate court. Such a practice would destroy the purpose of an appeal and make the supreme court one for deciding questions of law in the first instance." *Sanchez v. Arave*, 120 Idaho 321, 322 (1991) (quoting *Smith v. Sterling*, 1 Idaho 128, 131 (1867)). It does not protect the inferior courts to preclude a party from bringing an issue up on appeal that was not apparent until after the final ruling in the case. That does nothing to further the over 150-year-old rational for the rule.

Respondents also use *Black v. DJO Glob., Inc.* which they have reverse-engineered their argument to compliment. However, *Black* has no bearing on the issue in any manner whatsoever. The *Black* holding addresses wholly different issues and, more critically, a procedural history that has no similarity to the present case. *Black* states that if the issue of a breach of warranty claim is raised for the first time on appeal, the Idaho Supreme Court will not consider that issue. *Black v. DJO Glob., Inc.*, 168 Idaho 849, 855 (2021). The Court in *Black* is correct in that respect. But that does not matter because the issue of bias in the current matter is an overarching theme that manifested itself in the very ruling that came at the end of the lower court case, circumscribed all outstanding motions and then butchered both the law and facts in such a fashion that there was no remedy other than to raise the flawed ruling on appeal and the very nature of the lower court's approach to the case when it manifested itself. If Respondents' arguments were followed, then Julene and Bill would have to raise the issue of judicial bias at a time where judicial bias was

25

neither suspected nor apparent. The absurdity of such a proposition does not justify further exposition on the topic.

Additionally, Respondents cite to *Bach v. Bagley* which can be distinguished from our case in several ways. *Bach v. Bagley* involves Bach who alleged judicial bias but whose only provided authority on judicial bias is *Liteky*, whose standard he falls short of, and who does not "make any citations to the record that evidence any specific bias or prejudice by" his judge but instead attacks the judge's "findings of fact, his rulings on various motions, and his performance as trier of fact on equitable issues." *Bach v. Bagley*, 148 Idaho 784, 792 (2010). Further, the judge ruled in favor of Bach when Bach presented meritorious claims. *Id.* In our case, Julene and Bill do make citations to the record that evidence specific bias by the lower court and do not merely attack her findings of fact, rulings on motions, and performance as trier of fact on equitable issues or out some conspiratorial bent. Moreover, the lower court did not rule against Julene and Bill selectively or impartially, causing irritation at being wrong on this issue or that. This appeal is not taken because Julene and Bill are put upon at losing their case. This appeal, and the grave allegations made in their briefing, is the result of the lower court casting aside the law, ignoring the facts, adopting the non-logic of Defendants' positions and taking a bludgeon to Julene and Bill's requests to be made whole for the injuries they suffered. The origin and nature of the lower court's bias is irrelevant. What matters is that there is no other explanation for a ruling as defective and defectively engineered in favor of Respondents as that from which this appeal is taken.

There is a host of cases from the Ninth Circuit that refute Respondents' claim that an issue absolutely must be brought before the trial court to be later raised on appeal. For example, In *United States v. Bosch*, the Ninth Circuit stated that "a party's failure to move for recusal at the trial level does not preclude his raising the issue on appeal…a party's failure to move for recusal

26

will significantly affect the appellate standard of review and that party who made no motion in the trial court will bear a greater burden on appeal in demonstrating that the judge committed reversible error in failing to grant recusal under section 455." *United States v. Bosch*, 951 F.2d 1546, 1548 (9th Cir. 1991) (internal quotations omitted) (internal citations omitted). Under these circumstances, the court will use the plain error standard and plain error will only be found if the error was highly prejudicial and there was a high probability that the error materially affected the verdict." *Id.* But, the court also notes that because "Bosch was aware of the alleged grounds for recusal [that the prosecutor had served as the judge's law clerk and the two were still close] at the time of his motion for a new trial, and therefore could knowledgeably have raised the issue at that time," prior case law would "support a refusal to hear his claims now." *Id.*

Further, in *Yuhua Zhu v. United States Dep't of State*, the Ninth Circuit did not refuse to hear the plaintiffs' claim of judicial bias because they raised it for the first time on appeal, but it did note that because the plaintiffs presented "no facts to suggest that the judge's impartiality may reasonably be questioned or that he had a personal bias toward one party," that the claim was unpersuasive. *Yuhua Zhu v. United States Dep't of State*, 2022 U.S. App. LEXIS 32215, 4 (9th Cir. 2022).

### 2. Ample Instances of Bias (as Properly Defined) Exist in the Plain Text of the Lower Court's Order

It is truly remarkable in itself that a ruling as lengthy as that prepared by the lower court should, after countless granular readings, remain as glaringly defective as it did after one brief review. In Julene and Bill's case, by emphasizing that "Plaintiffs were required to disclose a complete statement of *all opinions* to be expressed by their retained experts on or before" the deadline, the district court is precluding Julene and Bill from supplementing their expert testimony. R. 4941:12–13. If in fact, *all* opinions must be given by the discovery deadline, then it is impossible

for the "substance [or] subject matter of an expert's testimony" to be "modified, expanded upon, or otherwise altered in some manner." *Edmunds* at 874.

The lower court shows no analysis of any facts when deciding to strike the testimony of Dr. Simon or Nurse Czarnik. R. 4928–53. Rather it makes sweeping conclusory statements such as, "[t]he Court agrees that in striking Dr. Simon's declarations, Dodds cannot show that they have 'some chance of success' in the underlying medical malpractice action;" and "[d]efendants cite *Easterling v. Kendal* and *Farr v. Mischler* and argue that Ms. Czarnik's November 3, 2022, witness disclosure does not comply with the Court's scheduling order and therefore her subsequent report and testimony should be excluded as untimely. The Court agrees."  R. 4953:3–4; R 4930:19–23.

The Court ruled in favor of Respondents on their motion in limine re: the testimony of Nurse Czarnik and ultimately excluded her late disclosures. R. 4930, L. 23. The Court agreed with Respondents that "Ms. Czarnik's November 3, 2022, witness disclosure [did] not comply with the Court's scheduling order and therefore her subsequent report and testimony should be excluded as untimely." *Id.* The Court cited the guidelines for imposing sanctions laid out in Idaho Rules of Civil Procedure 16 and 37. R. 4930:3–16, 19–37; R. 4931:8–27. Although Ms. Czarnik stated in her Disclosure that was filed on January 3, 2022, that "[t]he preparation and submission of my report of opinions was unexpectedly interrupted for several weeks due to the death of a member of my immediate family," as grounds for the tardy disclosure, the Court did not view this as substantial justification for delay. R. 4930:12–13 &23.

The Court stated "[a]lthough Plaintiffs claim that they did not disclose Ms. Czarnik's opinions sooner because Ms. Czarnik experienced a death in her family, Plaintiffs have not provided the Court with sufficient information to determine whether there was a legitimate reason

28

or excusable neglect as to why they did not offer these new opinions by November 4, 2022."

R4935:6–10.

The Court cannot just strike testimony because a scheduling order was violated especially when doing so essentially amounts to a judgment against the offending party. *Roe v. Doe*, 129 Idaho 663, 667–68 (Ct. App. 1996). In *Roe v. Doe*, the Idaho Court of Appeals ruled that sanctions that kept a party from presenting evidence on a crucial issue was essentially the same as ruling against the party as to those issues. *Id.* "Precluding a litigant from presenting evidence on crucial issues prevents a thorough examination of the merits at trial and in many circumstances will be tantamount to ordering judgment against the litigant on those issues. Some balancing of the equities and some consideration of the efficacy of lesser sanctions must precede a trial court's imposition of a sanction which will significantly impair a party's ability to present its case on the merits at trial." *Id.*

There is a balancing test that should be done when a judge is deciding whether to issue sanctions and what sanctions to issue. *Id.* "A trial court must balance the equities by comparing the culpability of the disobedient party with the resulting prejudice to the innocent party. (Citation omitted) Second, a trial court should not impose a sanction that will prevent a full adjudication of a case on the merits without having first considered lesser sanctions and having reached a conclusion, supported by the record, that lesser sanctions would be ineffective or inadequate." *Id.*

Further, "[t]he trial judge must balance the equities by comparing the culpability of the disobedient party with the resulting prejudice to the innocent party in light of the twin aims of the sanction power [encouraging compliance with discovery and punishing misconduct]. Only after applying this balancing test, the court should impose a sanction which will most substantially lead to the efficient administration of justice." *Southern Idaho Production Credit Association v.*

29

*Astorquia*, 113 Idaho 526, 532 (1996) (Donaldson, J., concurring.). It does not appear that the lower court did any balancing here. R. 4928–4953. Rather, she presumed that an order was violated and took the harshest measures available. *Id.* Moreover, Julene and Bill gave good cause as to why the order was late, Nurse Czarnik's mother died. R. 2578:7–8.

The court in *Cummings v. Stephens*, a case that the lower court uses as authority, brushes off an argument that an order to exclude a witness was improper because balancing was not performed. *Cummings v. Stephens*, 157 Idaho 348, 361 (2014). But, in *Cummings*, Plaintiffs and Defendants were both sanctioned with the exclusion of expert testimony, the excluded experts were each going to testify as to the same matter, and, as further distinguishment from the instant case, the only reason Cummings gave for his late disclosure was that his expert did not give him a written report until three months after the deadline for expert disclosures. *Cummings* at 360–61. Unlike the instant case, the sanctions *in Cummings* were not prejudicial to either party, but were fair and even.

## IV.    CONCULSION

This is an important case, not solely because of the destruction the Idaho medical, legal, and now judicial systems have inflicted on Julene and Bill without accountability, not solely because the law and facts have been disregarded to manufacture an outcome that demonstrates the patronage between bench and bar, and not solely because the current state of Idaho law requires a deeper, constitutionally-oriented review to hold the District Court accountable. This case is important because this Court has been given the opportunity to demonstrate whether impartiality for Idaho litigants, injured as Julene and Bill have been, can exist in a system where a certain game with unspoken rules has been played to the detriment of those injured by those in whom trust and faith have been placed.

The lower court's rulings must be reversed as a matter of law and of fact, that much is clear. However, this appeal is about far more. As the forum of last resort (in the state court system, anyway), Julene and Bill look to this Honorable Court with both hope and expectation.


DATED:      14 December 2023        Respectfully Submitted,

                                    For ROSA PLLC:


                                    */s/Angelo L. Rosa*

                                    _____

                                    Angelo L. Rosa
                                    Attorneys for Plaintiffs-Appellants
                                    JULENE DODD and WILLIAM DODD


31